Filed 5/27/15  P. v. Enloe CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071987 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F06420) |
| v. | |
| PATRICK THOMAS ENLOE, | |
| Defendant and Appellant. | |

Four very young prostitutes, who did not know each other, testified to a remarkably similar modus operandi:  defendant Patrick Thomas Enloe picked them up in his car or van; drove them to a dark and secluded location against their will; verbally demeaned and threatened them; forcibly raped them, sodomized them, and/or digitally penetrated their vaginas, maybe with a weapon; refused to use a condom; and did not pay them.  His defense was consent.  He was charged with 18 counts and various weapons enhancements against the four victims for sexual assaults in 2008, 2009, and 2011.  A discriminating jury convicted him of 12 counts against three of the victims, acquitted him of 3 counts but found him guilty of a lesser included offense on one of the acquitted

1

counts, and hung on 3 counts against one of the victims. The trial court sentenced him to state prison for a six-year determinate term to be served consecutively to a 175-year indeterminate term. Defendant asserts instructional error, insufficiency of the evidence, prosecutorial misconduct, ineffective assistance of counsel, and sentencing error. Finding no reversible error, we affirm the judgment.

## FACTS

Sadly, defendant preyed on young prostitutes. Not surprisingly, these young girls lied to the police, afraid that their children would be taken from them, they would be prosecuted for prostitution, or that the man who raped them would escape punishment. All but one had drugs in their systems when he raped them. The prosecutor explained to the jury that he could not choose his victims and he acknowledged their shortcomings. Nevertheless, each victim had a painfully disturbing story to tell the jury. We describe their ordeals chronologically.

### A.D.—February 7, 2008

Sixteen-year-old A.D. placed an ad for her services as a prostitute on craigslist.com. On February 7, 2008, defendant responded by phone, offering her $100 for a "car date." A car date, according to A.D., meant he wanted to have sex in his car. Although she preferred a safer venue, she agreed but insisted that sex would be "covered," that is, he needed to use a condom. They agreed to meet at the intersection of Bell and Austin for a car date.

Defendant picked her up at the assigned intersection in a red car. Although their encounter seemed amiable at first, defendant's demeanor changed abruptly once he parked in a gated area between two buildings. According to A.D., defendant appeared angry and told her, "We can do it the easy way or the hard way." He reached for something in the backseat that was covered in a blanket and appeared to A.D. to be a bat. Then he climbed over the console and kneeled on the floorboard between her legs. He told her he was not going to pay her and she had to do what he told her to do.

2

Defendant pulled out his penis and demanded that A.D. remove her pants. As he started to pull them down, she stated, "[W]hoa, whoa, let me get the condom." He refused to use the condom and said, "[D]on't make me hurt you." He was playing with his penis with one hand and playing with her vagina with other. He put his fingers into his mouth to produce some kind of green spit or mucus on his fingers and then reinserted his fingers into her vagina.

Defendant told A.D. to suck his penis, but she refused. She explained she did not "suck dick." He became frustrated when he could not get an erection and demanded that she show him her breasts. He groped one of her breasts while he masturbated. He then inserted his penis into her vagina and, after five or six thrusts, removed his penis and ejaculated on his hand, the car seat, and A.D.'s leg. He got out of the car and put whatever was in the backseat into the trunk. He drove out of the complex and dropped her off.

A.D. walked home. On the way, she called the police. She candidly admitted at trial that many of the initial statements she made to the responding officers were lies. She did not admit she was a prostitute for fear that her assailant would not get into trouble for raping her. And she told a series of lies about how defendant got her number, the directions she gave him, how he entered the car from the passenger side after they parked, and that she had accepted cash for sex only from friends.

While performing a sexual assault examination, a nurse practitioner observed a four- to five-millimeter tear to the vaginal opening that was consistent with vaginal penetration.

*Ashley D.—February 17, 2009*

Twenty-year-old Ashley D. worked as a prostitute out of the Tradewinds Motel. She lived in a room at the motel with her child and the child's father, and needed money to pay for the room. They would leave the room when she was working. Shortly after 5:00 a.m. on a cold and rainy February morning in 2009, she walked out of a convenience

3

store and saw defendant in the driver's seat of a red car parked in front of the store. He rolled down the window and asked her if she wanted a ride. Hoping that he was going to be a customer, she got into his car.

Ashley gave defendant directions to her motel room, but he ignored them, pointed a semiautomatic handgun at her, and said, "[S]hut the fuck up, do what the fuck I say, and I'll let you go, I'm gonna fuck you." He pulled into a secluded area behind some industrial buildings and parked in the loading dock behind a Tough Shed business. He parked so close to the wall that Ashley could not get out of the car when she tried to open the door.

Defendant instructed Ashley to take off her pants and to put her legs up on the dashboard. He climbed over to the passenger side and situated himself between her knees. He fumbled with his penis but was unable to put it into her vagina because he was not erect. He told her, "I'm going to fuck you, you little dirty black bitch." He penetrated her vagina with his penis for three to five minutes, but his semiflaccid penis fell out three or four times. He ejaculated and then put the barrel of the gun partially inside her vagina, far enough to make it hurt. He said, "You know you like it, you dirty little black bitch."

Defendant got back into the driver's seat, and when asked why he had raped her, he responded, "[B]ecause I can." As a garbage truck approached, defendant pulled out of the loading dock, stopped the car, and told Ashley to get out. She ran to the garbage truck after defendant drove away and told the truck driver she had been raped, asked for a pen and paper, and wrote down what she could remember of defendant's license plate number. She was anxious to get back to her room, and she called the father of her baby from a pay phone while en route to the motel. After meeting him, she used his cell phone to call the police. She reported the rape, but although she told the responding officers she was a prostitute, she lied to them about not working that morning and made up a story

4

about whom she was with. She was afraid the police would think that her baby's father was her pimp.

The garbage truck driver corroborated Ashley's testimony that she had approached him, told him she had been raped, and asked for a pen and paper or cell phone to record the license plate number. A nurse practitioner testified that during a sexual assault examination, Ashley told her that defendant held the muzzle of the gun to her vagina but it did not go into the vaginal canal. A deputy sheriff found a knife in defendant's car, but he did not find a gun either in his car or at his house. A detective, executing a search warrant at the home of defendant's parents, found a semiautomatic pistol in a locked cabinet with a bill of sale dated January 22, 2009.

Ashley admitted that she did not stop prostituting after defendant raped her. She explained that she needed to continue prostitution in order to survive. She also admitted she had used marijuana, methamphetamine, and amphetamine prior to the rape.

### *Amanda D.—August 29, 2011*

The mother of three young children, 22-year-old Amanda D. was prostituting herself to buy diapers on the night of August 29, 2011. Her husband had just been incarcerated. Defendant pulled into the parking lot where Amanda was advertising her availability and told her he was willing to pay $100 for vaginal and oral sex. She got into his van expecting to have sex with him for money.

Defendant started driving, but when Amanda told him she wanted to go in a different direction, he took out a knife and held it to her neck. Pulling into a business complex, he threatened, "Bitch, I'm going to fucking kill you. You're going to have sex with me. You're going to do this and everything I fucking say." They encountered a large yellow dog, barking loudly. Defendant appeared angry and threatened to kill the dog. Amanda was crying, explaining that she had three children and asking why he was doing this.

5

After parking, defendant ordered Amanda to the back of the van. He refused to use the condom Amanda offered. He grabbed her hair, told her to take off her black leggings, and demanded that she orally copulate him. She was crying, and continued to cry, as he forced his penis into her mouth and then into her vagina. Amanda estimated that during the initial rape, defendant's penis fell out about five times and he had to reinsert it.

After sexual intercourse, defendant announced that he would "fuck [her] in [the] ass." He put his penis into her anus, but because she was screaming and crying in pain, he put it back into her vagina and ejaculated. Defendant took her cell phone, refused to return it, and forced her out of the van before she could put her shoes on. He threw her boots out of the window and sped away.

Hysterical, Amanda approached another driver, who had parked in a driveway across the street, and asked to borrow a phone. The driver called 911 as Amanda curled up in a fetal position on the driveway. Like A.D. and Ashley, Amanda denied she was working as a prostitute and concocted an elaborate, but false, story about how she had ended up in such a dangerous predicament. She testified that she told these lies because she was afraid child protective services would take her children if she were to admit she was a prostitute. At trial, she admitted to smoking marijuana the day of the rape and to having used cocaine two days earlier.

During an interview a few days later, Amanda agreed to tell the truth. She told the detective that defendant forced her to orally copulate him, put his fingers into her vagina, put his penis into her vagina, put his penis into her anus, and then put his penis back into her vagina. She also reported that during the rape, defendant forced her to expose one of her breasts and he grabbed it. At trial, she could not remember if he had put his finger into her vagina or grabbed her breast. The detective went to the scene and saw a dog in a trailer in the far corner of the complex. Surveillance video taken on the night of the

6

attack provided additional corroboration—a van driving to the end of the complex and, after the van made a U-turn, a dog chasing the vehicle.

A sexual assault nurse examiner testified that Amanda told her defendant had, among other things, put his finger into her vagina. The examiner did not see any injuries to Amanda's vagina or anus.

An expert in DNA analysis testified that the major contributor to the sperm fractions found on the vaginal swabs taken from Ashley and Amanda matched defendant's DNA profile.

### India H.—September 16, 2011

India H., a 16-year-old prostitute, advertised her services on an Internet site. She testified that defendant responded to her ad, breached the terms of their agreement, and forced her to orally copulate him and to have sexual intercourse. Defendant was charged with sexual battery, oral copulation, and raping India. The jury was unable to reach a verdict on those counts and the trial court declared a mistrial.

### The Defense

The defense was consent. Defendant did not testify. His lawyer vigorously cross-examined each of the victims, exposing their drug use, their prior inconsistent statements, their involvement with prostitution before and after the alleged attacks, and their duplicity with the police. A criminalist testified about the adverse effects marijuana and cocaine can have on perception and memory. Defendant's father testified that he stored his handgun in a locked cabinet, and although he had shown it to defendant and defendant had been living at his parents' house, he had moved out by March 6, 2009.

Defendant appeals.

## DISCUSSION

## I

### *Sufficiency of the Evidence*

Lack of consent is an element of sexual crimes, including rape, forcible sexual penetration, and sexual battery. (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1535; *People v. Ireland* (2010) 188 Cal.App.4th 328, 336 (*Ireland*); *People v. Babaali* (2009) 171 Cal.App.4th 982, 995-996.) Even when a woman initially consents to engage in sex, her consent may be vitiated or withdrawn. Defendant insists there is insufficient evidence that two of the prostitutes, A.D. and Amanda, effectively communicated the withdrawal of their consent to have sex with him before he engaged in the sexual conduct to which they had agreed. While the evidence may have been susceptible to the inferences defendant urges on appeal, we disagree that the record is devoid of evidence that is reasonable, credible, and of solid value such that a rational trier of fact could have found a lack of consent beyond a reasonable doubt.

In rearguing the evidence, defendant fails to abide by the limited scope of appellate review. Although we must review the entire record to determine if the evidence supporting the verdict is substantial in light of other facts (*People v. Holt* (1997) 15 Cal.4th 619, 667), we must view the evidence in the light most favorable to the prosecution and presume "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053). " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

A similar challenge to the sufficiency of the evidence was raised and rejected in *Ireland*, *supra*, 188 Cal.App.4th at pages 335-338. In *Ireland*, as here, the defendant was charged with raping four prostitutes, each of whom had consented to engage in sex acts in

8

return for money. (*Id*. at pp. 330-333.) He too contended there was insufficient evidence to establish that each woman withdrew her consent and communicated that withdrawal of consent to him. The court found otherwise.

The court reviewed the contours of consent. CALCRIM No. 1000, as given here and in *Ireland*, instructs that " '[t]o consent, a woman must act freely and voluntarily and know the nature of the act.' " (*Ireland*, *supra*, 188 Cal.App.4th at p. 336.) But " '[a]ctual consent must be distinguished from submission. [A] victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made ([Pen. Code,] § 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will. [Citation.]' [Citation.]" (*Ireland*, at p. 336.)

If, however, the woman fails to communicate her lack of consent and it could not reasonably be detected, the court reminded us the accused might not be guilty of rape. (*Ireland*, *supra*, 188 Cal.App.4th at p. 336.) Indeed, it is a defense if the accused reasonably and in good faith believed the woman engaged in the act consensually. (*Ibid*.) It is important to note, particularly when the victims are prostitutes, however, that withdrawal of consent can occur at any time. (*Ibid*.)

Despite the frightening fact that the defendant held a knife to the neck of each of his victims, he argued his use of the knife did not automatically negate their consent. Instead, he contended that each victim was required not only to withdraw her consent but also to communicate that withdrawal to him, if not expressly, then at least by implication. The court rejected that notion as a matter of law. "When appellant used the knife and expressly or impliedly threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent, the previously given consent no longer existed, either in fact or in law." (*Ireland*, *supra*, 188 Cal.App.4th at p. 338, fn. omitted.)

9

Moreover, even if the victims were required to communicate the withdrawal of their consent, the court found ample evidence they had. (*Ibid.*)

Defendant insists that the court's rationale in *Ireland* depends on the use of a deadly weapon. He argues that he did not use a weapon at all during his sexual encounter with A.D., and he touched Amanda's breasts before he displayed a knife. Thus, in his view, in the absence of a weapon to vitiate a woman's consent, she must affirmatively withdraw her consent and communicate her withdrawal to her customer. Not so.

We reject the notion that *Ireland* applies only when a man threatens his victim with a deadly weapon. While it is true that factually the defendant in *Ireland* used a knife, we do not believe that fact alone was dispositive and the case should be read so narrowly. The focus in *Ireland*, as here, is whether the sexual acts were consensual, and that issue is necessarily more complicated when prostitution is involved. But prostitutes do not forfeit the right to withdraw their consent by virtue of their line of work, and they retain that right whether or not a deadly weapon is displayed. To resolve an insufficiency challenge, we must look at all of the facts to determine whether there is evidence of credible, solid value that A.D. and Amanda had consented to engage in the sexual acts at the time they occurred. The absence of a deadly weapon is but one fact to consider, but it does not render *Ireland* irrelevant to our analysis.

## A. A.D.

Sixteen-year-old A.D. conditioned her consent on defendant's willingness to use a condom and to pay her $100. She testified that although she and defendant initially had a lighthearted conversation, his mood changed dramatically as soon as they arrived in a secluded location, and he appeared angry. Before they engaged in any sexual acts, he reached for something in the backseat of the car that she believed to be a bat and told her he would not pay her. He threatened, "We can do it the easy way or the hard way." She testified he was bigger than she was, and she was too afraid to risk pulling out the knife she kept concealed in her purse. He told her to remove her pants, and when she failed to

10

comply, he pulled them down. He also refused to use the condom as promised and again threatened to hurt her.

Defendant contends that these facts fall woefully short of what is necessary for a prostitute to withdraw the consent she previously gave to engage in sex acts. He emphasizes that he did not wield a knife, as in *Ireland*, or a gun, or, for that matter, any deadly weapon. His remarks at best were ambiguous. He also suggests that A.D.'s request for him to use a condom was a "reaffirmation of the consent to sexual relations previously given." And, he emphasizes that when asked to orally copulate him, A.D. refused and they proceeded to engage in other sexual acts. He argues that her resistance is evidence that she was able to successfully communicate her boundaries and to refuse to engage in certain sex acts when they offended her. In his view, therefore, there is insufficient evidence she withdrew her consent and communicated that fact to him.

It is true that the facts of *Ireland* present a much clearer case. Once a weapon is drawn it is nearly impossible to imagine a scenario where a woman's consent could be said to be free and voluntary. Here it was certainly the jury's prerogative to accept the inference urged by defendant that A.D.'s gutsy refusal to engage in oral copulation on demand indicated a willingness to voluntarily participate in other sexual acts. But the jury rejected that inference and, presumably following a litany of instructions explaining the meaning of consent, concluded that once she was taken to a secluded location, threatened by a big, angry stranger that she would be hurt, possibly with a bat she believed was in the backseat, and was restrained by him on the floor between her legs, she withdrew her consent to have sex as previously agreed.

We believe this evidence constitutes substantial evidence to support the jury's findings that A.D. did not consent to defendant's putting his fingers into her vagina, touching her breast, or putting his penis into her vagina, particularly when taken with her direct testimony that she told defendant she did not want to have sex after he told her he would not pay her as agreed. Additionally, the jurors could have reasonably concluded

11

that in those harrowing circumstances, A.D. simply could not freely and voluntarily consent to have sex with defendant, and the withdrawal of her consent could be implied once he threatened her and refused to honor the terms of their agreement.

Alternatively, a rational juror could conclude that A.D. was not required to communicate her lack of consent because defendant induced her cooperation through force and fear. Although defendant contends his remarks were ambiguous, the jurors could have found statements like "do it the easy way or the hard way" and "don't make me hurt you" to constitute threats and her subsequent submission obtained through fear. He did not sexually penetrate her until after he had issued those threats. Consent given "out of fear of bodily injury is not consent . . . because the decision is not freely and voluntarily made." (*Ireland*, *supra*, 188 Cal.App.4th at p. 336.) A withdrawal of consent could have been seen by defendant as a refusal to submit and could have caused him to inflict injury on A.D. In other words, defendant placed his victim in a situation where she could not have withdrawn consent without risking bodily harm. Thus, any advance consent was vitiated by his explicit or implicit threats.

Defendant pays particular attention to the sexual battery conviction, arguing on appeal that there is no evidence A.D. was unlawfully restrained against her will when he touched her breast. "[A] person is unlawfully restrained when his or her liberty is being controlled by words, acts or authority of the perpetrator aimed at depriving the person's liberty, and such restriction is against the person's will . . . ." (*People v. Arnold* (1992) 6 Cal.App.4th 18, 28.) Although unlawful restraint requires more than the exertion of the physical force needed to commit the battery, it may be accomplished by words or acts. (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1661; *People v. Grant* (1992) 8 Cal.App.4th 1105, 1112.)

But this argument is yet another variant of the same theme, and defendant would have us usurp the role of the jury. Defendant rejects the inference a rational juror might have drawn that by the time he angrily threatened her in close proximity to what she

believed to be a bat and positioned himself between her legs, he had unlawfully restrained her by both his words and his actions. While it is also true the jury could have found the circumstances did not constitute the requisite unlawful restraint, we cannot say there is insufficient evidence to support the jury finding.

**B.    Amanda**

If the opening brief were closing argument and if, instead of appellate justices, we were jurors, we might be persuaded there was a reasonable doubt that defendant had brandished the knife before touching Amanda's breast. But, of course, it is not our role to second-guess the jury, only to insure that there is credible evidence of solid value to support the jury's finding. Evidence far less than compelling can be sufficient to uphold a jury verdict. Although the evidence of sexual battery consists of Amanda's secondhand account to an investigating police officer and the inferences drawn from the officer's testimony, as well as that officer's examination of Amanda about her initial fabricated account, we conclude it constitutes the quantum of evidence necessary to sustain the judgment.

We acknowledge there are inherent weaknesses in the evidence of sexual battery. At trial, Amanda testified that she did not remember if defendant ordered her to lift her bra or if he touched her breast. As a result, the prosecution relied on Amanda's hearsay statement to Detective Michelle Hendricks. Adding to the lack of clarity in the trial transcript, Detective Hendricks testified that she was relying, in part, on an earlier statement Amanda had given to Deputy Warren. But that initial statement was fraught with lies. We distill the following pertinent testimony from the record, focused as defendant insists we must on the chronology of what transpired after Amanda got into defendant's van.

Detective Hendricks interviewed Amanda the day after defendant sexually assaulted her and again two days later. During the latter interview, Amanda agreed to tell the truth. In her first two statements, she had admittedly lied to conceal from the police

13

that she was engaged in prostitution on the night defendant sexually assaulted her. Thus, Detective Hendricks asked a series of questions about what transpired in the van and how her current description varied from her earlier accounts.

During her various renditions of what happened on the night of August 29, 2011, and at trial, Amanda consistently reported that defendant pulled out a knife as soon as they passed a blue Adopt-a-Highway sign on Roseville Road. Holding the knife to her neck, defendant told her "he was going to have sex with her, and she was going to do everything he wanted." She described how they proceeded to a business complex, encountered a barking dog defendant threatened to kill, and how he backed up against a fence at the end of a building.

The prosecutor asked Detective Hendricks to recount what Amanda said had occurred once defendant parked the van. Amanda told Hendricks defendant ordered her to the rear of the vehicle. The prosecutor then asked, "What were the sexual acts that Amanda described occurring inside the van?" The detective described, "[i]n order of occurrence," oral copulation, digital penetration, rape, sodomy, and another rape, all of which were without Amanda's consent. Amanda recounted that "she was crying constantly and crying hysterically."

In this context, the prosecutor asked, "Did Amanda tell you whether or not the man, the suspect, ever touched her breasts?" Responding affirmatively, Detective Hendricks said, "She stated at one point he had her lift one of the cups of her bra, exposing one of the breasts and grabbed that breast."

Seizing on the detective's use of the phrase "at one point," defendant broadens the potential time horizon to which she was referring from the sex acts that occurred after defendant parked to encompass the entire time they were in the van. We agree with the Attorney General that a rational juror might have inferred that the detective was describing what occurred only after defendant parked in a secluded area, after he threatened her with the knife, and after he threatened to kill the dog. While defendant

14

might have made a plausible argument to the contrary, the jurors were not compelled to accept it and clearly they did not.

But by dissecting the record further and extracting bits and pieces from here and there, defendant goes further in speculating that any touching of Amanda's breast occurred before, and not after, he pulled out the knife. He relies on another part of Detective Hendricks's testimony. Whereas in the interrogation recited above the prosecutor had specifically asked Hendricks to describe what Amanda reported happened after they had parked, defendant now relies on questions the prosecutor asked about Amanda's cell phone. He cleverly pieces together another possible scenario, as follows.

In her initial statement, Amanda told Deputy Warren that her cell phone fell out when defendant ordered her to lift up her bra. In her later interrogation with Detective Hendricks, she said she took it out when she received a call and defendant took it from her once they passed the blue sign. Thus, based on when Amanda turned over her cell phone, defendant posits that the evidence shows he grabbed Amanda's breast "around the time that the phone fell out," and he concludes "[b]ecause the knife was pulled after they passed the blue sign, the evidence shows that the breast was grabbed *before* the knife was deployed." The jury might have accepted that version of what transpired, but it did not.

The question thus posed is whether a rational juror could draw a contrary inference based on the evidence before it. The answer is yes because the inference is reliant upon a statement that is fraught with lies. Amanda admitted that she lied repeatedly during her first two statements to the police. Yet defendant's argument is premised on the account Amanda gave to Deputy Warren that the cell phone fell out when defendant told her to lift up her bra and her later statement to Detective Hendricks that she gave the cell phone to defendant just after they passed the blue sign. The jury was certainly free to disregard the contents of her first statement since it was littered with lies and to credit the chronology recounted by Detective Hendricks when Amanda represented that she was telling the truth. If that account is to be believed, then the sexual

15

battery occurred after defendant threatened her with the knife and consent is no longer a viable issue. While we agree with defendant the evidence is not a model of certitude, there is sufficient evidence to support the jury's verdict.

**II**

***Instructional Error***

## A.      Withdrawal of Consent

The court instructed the jury on consent as an essential element of each of the relevant charged offenses against A.D. As to sexual battery, the court explained, in the language of CALCRIM No. 935, that the jury needed to find the "touching was done against [A.D.'s] will." The instruction further provided: "An act is done *against a person's will* if that person does not consent to the act. In order to *consent*, a person must act freely and voluntarily and know the nature of the act." (*Ibid.*)

Similarly, the court instructed the jury that defendant was guilty of sexual penetration only if the "other person did not consent to the act." (CALCRIM No. 1045.) The court also explained: "The defendant is not guilty of forcible sexual penetration if he actually and reasonably believed that the other person consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. If the People have not met this burden, you must find the defendant not guilty." (*Ibid.*)

And, of course, to convict defendant of rape, the jury was required to find that "[t]he woman did not consent to the intercourse." (CALCRIM No. 1000.) The rape instruction further explains, "To *consent*, a woman must act freely and voluntarily and know the nature of the act." (*Ibid.*) "Evidence that the woman requested that the defendant use a condom or other birth control device is not enough by itself to constitute consent." (*Ibid.*)

"The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse. The People have the burden of proving beyond a

16

reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty." (CALCRIM No. 1000.)

The jurors were therefore instructed on the principles of law closely and openly connected with the issue of consent as applied to each of the charged offenses. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) But the evolution of the law can trigger some unintended consequences. Here defendant contends that the attempt to clarify the parameters of withdrawing consent during a rape leads to a mistaken implication that the same rules regarding the withdrawal of consent *during* penetration do not apply *before* penetration and *before* a sexual battery or forcible sexual penetration. We examine the evolution of the instructions given, assess how a reasonable juror would construe the instructions when taken as a whole, determine whether defendant's attorney should have requested a clarification and, if so, whether the failure to do so was harmless beyond a reasonable doubt.

Defendant identifies CALCRIM No. 1000 as the culprit. The instruction reads, in pertinent part: "A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if:

"1. She communicated to the defendant that she objected to the act of intercourse and attempted to stop the act;

"2. She communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent;

"AND

"3. The defendant forcibly continued the act of intercourse despite her objection."

In *People v. Vela* (1985) 172 Cal.App.3d 237 (*Vela*), the court held that "a victim may give consent during preparatory acts all the way up to the moment of penetration, but the victim may withdraw that consent immediately before penetration and if

17

communicated to the perpetrator, the act of intercourse that follows will be a rape no matter how much consent was given prior to penetration." (*Id*. at p. 242.) But in *In re John Z.* (2003) 29 Cal.4th 756, 761 (*John Z.*), the Supreme Court rejected the apparent rule of *Vela* that penetration creates a boundary line changing the rules governing withdrawal of consent. The court held that a woman could withdraw her consent to sexual intercourse at any time, even during copulation, as long as that withdrawal was clearly communicated. (*John Z.*, at p. 763.) These cases recognize that the essence of consent is the exercise of free will at the time the sexual act is perpetrated. Because what begins as a consensual encounter can disintegrate into an unwelcome intrusion at any time, the courts have clarified that consent may be withdrawn, which is but another way to say that the victim's participation no longer remains an exercise of free will.

CALCRIM No. 1000 attempts to embody the nuances of consent based on the facts of the cases in which the rules evolved. *Vela* and *John Z.* both involved rapes. Moreover, the precise issue in those cases was whether consent could be withdrawn after penetration. Defendant insists that the standardized instruction is incomplete as applied to rape when A.D. arguably withdrew her consent *before*, and not *during*, the rape and simply does not address other sexual crimes, including sexual battery and forcible penetration. As a result, he contends the trial court had a sua sponte obligation to instruct the jury as follows:

"A woman who initially consents to an act of intercourse *[or other charged sexual act]* may change her mind *at any time before or* during the act. If she does so, under the law, the act of intercourse is then committed without her consent if:

"1. She communicated to the defendant that she objected to the act of intercourse *[or other charged sexual act]* and attempted to *prevent or* stop the act;

"2. She communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; AND

18

"3. The defendant forcibly *initiated or continued* the act of intercourse *[or other charged sexual act]* despite her objection."

In the absence of these modifications, defendant contends CALCRIM No. 1000 would have misled the jurors by failing to inform them that if a victim changed her mind before intercourse, touching, or penetration, she must have communicated her objection to him. He argues the court's dereliction of duty to instruct the jury on all of the essential elements of the crimes requires reversal of the counts involving A.D. He points out that the court in *Ireland* recognized the instruction could have been confusing. (*Ireland*, *supra*, 188 Cal.App.4th at p. 340.)

But a "party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate amplifying, clarifying, or limiting language." (*People v. Farley* (1996) 45 Cal.App.4th 1697, 1711.) As described above, the court presented a panoply of instructions explaining consent as it related to each of the charges involving A.D. Those instructions were a correct description of the law. If, as defendant urges on appeal, the instruction was incomplete, he should have requested the amplifying language he now deems helpful.

Defendant insists that forfeiture is trumped by the court's sua sponte obligation to instruct and his lawyer's incompetence in failing to request the amplifying instruction. But defendant's argument fails on the merits as well. We return to the guidance provided by the court in *Ireland*.

In *Ireland*, the court held that where a woman's cooperation is induced by force or fear, she is not required to communicate her lack of consent. (*Ireland*, *supra*, 188 Cal.App.4th at pp. 337-338.) Here, after parking the car, defendant made it clear that he planned to rape A.D. He angrily told her they "could do it the easy way or the hard way." Refusing to wear a condom, he threatened: "I'm not gonna [*sic*] get you pregnant, don't make me hurt you." The jury heard A.D. recount that defendant's mood changed,

19

he threatened her, and he reneged on their agreement. She saw what she thought was a baseball bat.

Thus the evidence showed that as in *Ireland*, A.D. submitted to defendant's demands, but her submission, induced by force or fear, did not constitute consent. The jury in *Ireland* was also instructed with CALCRIM No. 1000, which contained the identical language defendant challenges here. (*Ireland*, *supra*, 188 Cal.App.4th at p. 339.) And the defendant in *Ireland* also argued that the instruction failed to explain that a woman must communicate her withdrawal of consent prior to penetration. (*Ibid*.) The court found the defendant's hair splitting between pre- and postpenetration withdrawal of consent immaterial given that the force or fear he used vitiated any need for his victim to communicate the withdrawal of consent. (*Id*. at pp. 339-340.)

We agree. Whether or not his victim is a prostitute, a defendant who employs force or fear to obtain submission is not entitled to a sua sponte instruction on a victim's responsibility to communicate her withdrawal of consent. As the court in *Ireland* pointed out, the timing of the withdrawal of consent is immaterial. What is material is the means the defendant uses to obtain submission, and when the means involves force or fear, whether or not he wields a deadly weapon, the victim does not consent and she need not communicate any withdrawal of consent previously given.

## B.  Concurrence of Sexual Acts and Specific Intent

The court gave the pattern jury instruction, CALCRIM No. 252, on the required union of act and specific intent when the defendant is charged with a combination of general intent and specific intent crimes, but there was a clerical error in the written instruction and an omission of sexual penetration in the oral version. Defendant argues the errors require reversal. The Attorney General concedes the error but contends the error is harmless. We agree.

The trial court read CALCRIM No. 252 to the jury twice. In both readings, the court instructed the jury on the crimes requiring specific intent as follows, with a few

20

minor and insignificant transcription differences between the two: "The following crimes require specific intent or mental state: Willfully and unlawfully touch a person's breasts while unlawfully restraining that person for the purpose of sexual arousal, gratification or abuse, in violation of Penal Code Section 243.4(a), as charged in Counts 1, 6 and 15; kidnapping with the intent to commit rape, in violation of Penal Code Section 209(b)(1), as charged in Count 10; aggravated kidnapping, in violation of Penal Code Section 667.61(d)(2), as alleged in Counts 11, 12, 13 and/or 14; kidnapping, in violation of Penal Code Section 667.61(e)(1), as alleged in Counts 11, 12, 13 and/or 14; unlawfully and forcibly penetrating a person's genital opening by a foreign object, instrument or device for the purpose of sexual arousal, gratification or abuse, in violation of Penal Code Section 289(a)(1), as charged in Counts 5, 16 and 17.

"For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act but must do so with the specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime."

These oral renditions did not identify either sexual penetration against Ashley as charged in count fourteen or attempted sexual penetration as specific intent crimes. The written version contained a more glaring error. The general intent crimes were repeated twice and the specific intent crimes were missing. No one noticed the error at trial. The jurors were given the erroneous version of CALCRIM No. 252 to assist them with their deliberations. They did not ask any questions about it.

Defendant insists the error is of constitutional magnitude requiring a heightened scrutiny of harmlessness that simply cannot be met. He acknowledges there is no federal or state constitutional right to written jury instructions (*People v. Samayoa* (1997) 15 Cal.4th 795, 845 (*Samayoa*)), but that is not the issue. The error is not that the jurors were deprived of written instructions, but that the written version of CALCRIM No. 252 they were given incorrectly describes an element of the offense, and when a jury receives

21

both written and oral versions of the same instruction, the written version is deemed controlling.  (*People v. Wilson* (2008) 44 Cal.4th 758, 803 (*Wilson*).)

Although no one disputes the written instruction contained a technical error, the error was harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)  "First, the court orally instructed the jury with the correct instruction.  Although this court gives priority to the written version of an instruction when a conflict exists between the written and oral versions, the jury is not informed of this rule.  It is thus possible the jury followed the oral instruction.  Second, there is no indication the jury was aware of the slight difference between the written and oral versions of the instructions, as it asked no questions about this point."  (*Wilson*, *supra*, 44 Cal.4th at p. 804.)  Third, the evidence was overwhelming that defendant engaged in a repeated pattern with each of the prostitutes he lured into his car with false pretenses:  he promised to pay them and to use a condom, but as soon as he had them under his control he turned mean and violent, threatened them, refused to either use a condom or to pay them, forced them to commit a variety of sexual acts against their will, and ordered them out of the car when he finished with them.  Finally, considering the other instructions the jury was given with respect to each offense, there is no reasonable likelihood the jury applied the challenged instruction in an impermissible manner.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 831-832; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1216.)

For each of the specific intent crimes, including sexual battery, sexual penetration, and kidnapping, the jury was instructed that defendant must have committed the prohibited act with the specified intent.  Defendant critiques each of those instructions, maintaining they do not cure the deficiency created by the erroneous written instruction.  His critique is to no avail.

As to sexual battery, the jury was instructed with CALCRIM No. 935, which required the jury to find that "[t]he touching was done for the specific purpose of sexual

22

arousal, sexual gratification, or sexual abuse." Defendant argues that CALCRIM No. 935, standing alone, says nothing to require the jury to find that he touched the breasts of the complaining witnesses with the wrongful intent. However, the use of the phrase "for the purpose of" typically denotes a specific intent crime. (*People v. Atkins* (2001) 25 Cal.4th 76, 86.) We conclude there is no reasonable likelihood a juror would fail to understand that touching breasts "for the purpose" of sexual arousal, sexual gratification, or sexual abuse was a specific and wrongful intent and that the instruction required the union of act and intent.

As to sexual penetration, CALCRIM No. 1045 defines sexual penetration as follows: "Sexual penetration means penetration, however slight, of the genital or anal opening of the other person for the purpose of sexual abuse, arousal, or gratification." Because the jurors were instructed that defendant must have committed the act of sexual penetration by using a foreign object without consent by force, violence, duress, menace, or fear "for the purpose" of sexual abuse, arousal, or gratification, we conclude they were adequately instructed on the requisite union of act and specific intent. Nothing more was required.

CALCRIM No. 1203 explained the elements of kidnapping with the intent to commit rape. The Attorney General suggests that CALCRIM No. 1203 adequately instructed the jury on the requisite union of act and specific intent by requiring the jury to find that defendant intended to commit rape, and "[a]cting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear." Arguing the evidence more than the law, defendant complains that the instruction did not state that he needed to harbor the intent to rape at the precise moment his victims withdrew their consent. He finds the flaw particularly troublesome because the prostitutes had all freely jumped into defendant's vehicle and therefore the asportation began consensually. While his argument would have been great fodder for his closing statement, we do not believe the court was obligated to instruct with such specificity in

23

the absence of a request from defendant. The instruction quite clearly embodies the crucial element that the jury had to find he intended to rape his victim at the time he was taking, holding, or detaining her. Again, the instruction conveyed what the mistaken written instruction listing the offenses did not—that there must be a union of the criminal act with the specific intent required.

CALCRIM No. 460, concerning attempted sexual penetration, compels the jury to find that "[t]he defendant intended to commit an unlawful sexual penetration with a foreign object." As he argued with respect to CALCRIM No. 1203, defendant complains that CALCRIM No. 460 does not state when that intent must exist. However, no rational juror could fail to understand from the language quoted that there must be a concurrence of the act and the requisite intent.

In sum, the jurors were properly instructed twice from the bench, they expressed no confusion, and other instructions informed them of the necessity for a concurrence of specific intent and the various criminal acts. Thus, on this record, we conclude the clerical error was harmless beyond a reasonable doubt under the more rigorous *Chapman* standard defendant urges we employ.

## C.     Specific Intent for Sexual Penetration

Defendant offers an additional challenge to CALCRIM No. 1045, with a slightly different twist. Whereas, as discussed earlier, he complained the pattern instruction did not require a union of act and specific intent, in an attempt to reframe his argument he claims the instruction fails to describe the specific intent "*to gain* sexual arousal or gratification or *to inflict* abuse on the victim." In his view, CALCRIM No. 1045, taken alone, does not satisfy the intent requirement we announced in *People v. McCoy* (2013) 215 Cal.App.4th 1510 (*McCoy*). He suggests that the passive language in the instruction, "for the purpose of sexual abuse, arousal, or gratification," does not describe a specific intent because it does not include the active descriptors we employed in *McCoy*—"to

24

gain" or "to inflict." Defendant misunderstands *McCoy* and how jurors would reasonably interpret the instruction.

In *McCoy*, we held that sexual penetration is a specific intent crime and we approved the language of CALCRIM No. 1045. It is true, as defendant points out, that the trial court in McCoy also identified sexual penetration as a specific intent crime in delivering CALCRIM No. 252. But there is nothing in the language or rationale of *McCoy* to suggest that CALCRIM No. 1045, standing alone, does not describe the specific intent necessary to commit the crime of sexual penetration.

We observed in *McCoy* that the definition of sexual penetration "refers to the defendant's intent to achieve an 'additional consequence,' i.e., arousal, gratification or abuse. [Citation.] Thus, in drafting [Penal Code] section 289, the Legislature required the act of penetration to be committed with the specific intent to gain sexual arousal or gratification or to inflict abuse on the victim." (*McCoy*, *supra*, 215 Cal.App.4th at p. 1540.) Because CALCRIM No. 1045 incorporates the section 289 definition of penetration for the purpose of arousal, gratification, or abuse, it encompasses the specific intent necessary to commit the crime.

As for the reasonable likelihood a juror would misconstrue or misunderstand the instruction because it employs the passive tense and does not include the verbs "to gain" and "to inflict," we find the argument totally implausible. If a juror found that defendant either penetrated or attempted to penetrate his victim's vagina or anus for the purpose of sexual gratification, abuse, or arousal, he or she found the requisite specific intent we described in *McCoy* and there is absolutely no reasonable likelihood he or she misunderstood the instruction. We reject defendant's claim that the instruction misstated the law.

Defendant also complains that the forcible sexual penetration count against Amanda (count five) was left off the list of counts when the jury was instructed on the crime. He argues the jury was left ignorant about the elements of the crime constituting

25

count five.  We agree with defendant there was error, but we find it was harmless beyond a reasonable doubt.

Although CALCRIM No. 1045 failed to list count five, the information and the verdict form for count five identified the crime as forcible sexual penetration in violation of Penal Code section 289, subdivision (a)(1).  The prosecutor also cued the jury:  "In Count 4, he is charged with forcing [Amanda] to orally copulate him; Count 5, he is charged with penetrating her with his finger."  And again he stated, "Count 16, 17 on [A.D.], Count 14 on Ashley, and then Count No. 5 regarding Amanda.  What are the elements of this crime?"  The prosecutor then listed the elements of forcible sexual penetration.

We reject defendant's argument that the minor mistake in failing to include count five in one list of the forcible sexual penetration counts requires reversal.  The record demonstrates the jury was adequately informed that defendant was charged with forcible sexual penetration, it was adequately instructed on the elements of forcible sexual penetration, and the correlation between the two was obvious.  We therefore conclude beyond a reasonable doubt that the jury would not have reached a different result had CALCRIM No. 1045 explicitly stated that defendant was charged with forcible sexual penetration in count five.

**D.**     ***Mayberry* Defense**

A defendant's reasonable and good faith mistake of fact that a person has consented to sexual intercourse is a defense to rape.  (*People v. Mayberry* (1975) 15 Cal.3d 143, 155 (*Mayberry*).)  The so-called *Mayberry* defense has been extended to assault, battery, and unlawful touching.  (*People v. Rivera* (1984) 157 Cal.App.3d 736, 742-743 & fns. 7, 8.)  Although the trial court instructed the jury on the *Mayberry* defense as it related to the other charged sexual crimes, it failed to instruct sua sponte that the defense applied to sexual battery.  Defendant contends the court's failure to instruct sua sponte constitutes reversible error.

26

A sua sponte duty to give a *Mayberry* defense instruction arises " ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424.) "Thus, because the *Mayberry* instruction is premised on mistake of fact, the instruction should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*People v. Williams* (1992) 4 Cal.4th 354, 362 (*Williams*).) In fact, the Supreme Court expressly rejected the notion that the *Mayberry* instruction should be given in every case in which consent is offered as a defense. (*Williams*, at p. 362, fn. 7.)

The jury found defendant was a serial rapist. Yet by parsing the timing of his various exploitations of very young prostitutes, he claims there is substantial evidence he actually had a reasonable and good faith belief that they had consented to the touching of their breasts. His machinations are similar to those rejected by the Supreme Court in *Williams*.

In *Williams*, the defendant testified that his homeless victim initiated sexual contact, fondled him to overcome his impotence, and inserted his penis inside her vagina. (*Williams*, *supra*, 4 Cal.4th at p. 362.) The victim, however, testified that the sexual encounter occurred only after the defendant punched her, pushed her onto the bed, ordered her to take off her clothes, and threatened her. (*Ibid*.) The defendant insisted there was substantial evidence to support the *Mayberry* instruction given that consent was at issue, including evidence that the victim willingly accompanied him to the hotel, his testimony regarding the sexual encounter, and the fact that no one heard any screams or other indications of physical violence. (*Williams*, at pp. 361-363.) The Supreme Court, overturning the Court of Appeal's finding to the contrary, held that this evidence was not sufficient to trigger a duty to deliver a *Mayberry* instruction. (*Williams*, at pp. 362-363.)

27

The court differentiated evidence of actual consent from evidence of a reasonable and good faith mistake as to consent. If believed, the defendant's testimony would have established that his victim actually consented to the sexual encounter, not that her equivocal conduct gave rise to the defendant's reasonable belief that she had. (*Williams*, *supra*, 4 Cal.4th at p. 362.) The court also observed that the homeless victim's consent to accompany the defendant into a quiet and comfortable room was not evidence she consented to have intercourse, and to credit her willingness to accompany him was "to 'revive the obsolete and repugnant idea that a woman loses her right to refuse sexual consent if she accompanies a man alone to a private place.' " (*Id*. at p. 363.)

Defendant did not testify. But as in *Williams*, he too asserts there was substantial evidence to support a *Mayberry* instruction. Ignoring the recurring pattern and overwhelming evidence that he lured young girls into his car with false promises he would pay them and use a condom, only to turn abusive and violent, he dissects the timing of the sexual encounters with Amanda and A.D. and insists there is evidence he may have touched their breasts before he turned violent. He maintains the evidence leaves open the possibility that he may have touched Amanda's breast before he put the knife to her neck, and he may have touched A.D.'s breast before he refused to wear a condom. Whether or not the victims later withdrew their consent when he became violent, he asserts he could have reasonably believed that they willingly allowed him to touch their breasts early in the sexual encounters.

We conclude, as the Supreme Court did in *Williams*, there is not substantial evidence to compel a *Mayberry* instruction. His victims all testified to the relatively abrupt change in defendant's demeanor once they got into his car, the fear they experienced, and the force he used to compel their submission. Whether or not the victims had withdrawn their consent at the moment he touched their breasts is not determinative. For as the court instructed in *Williams*, it is the accused's reasonable and good faith belief whether she consented, not whether she had actually consented, that is

determinative. And it is offensive to suggest, as defendant does here, that a serial rapist entertained an honest and good faith belief his young victims freely assented to the touching when he knew he was engaged in a repeated pattern of violent domination and exploitation. There simply was no substantial evidence he could have entertained any reasonable or good faith belief that these vulnerable young girls continued to consent to the sexual acts he perpetrated, including the touching of their breasts.

### E.       Misdemeanor Sexual Battery

Defendant was charged with and convicted of felony sexual battery. He contends the trial court erred by failing to instruct on the lesser included offense of misdemeanor sexual battery. The Attorney General does not dispute that misdemeanor sexual battery is a lesser included offense, but she does dispute there is substantial evidence that A.D. and Amanda were not unlawfully restrained when he touched their breasts. Unlawful restraint marks the biggest distinction between the two crimes. Defendant reminds us that we must view the evidence in his favor in determining whether it is sufficient to trigger a sua sponte obligation to instruct on the lesser included offense.

To support his argument, defendant treads over well-worn terrain. He begins with the same indisputable fact that each victim was a prostitute who initially consented to get into his car to have sex with him. Then he picks apart the chronology and fills in any possible gaps with an inference in his favor. Without reiterating the same facts we have recited before, the essence of his argument is that it is possible he touched Amanda's breast before he pulled out the knife, and it is possible that he touched A.D.'s breast before he got between her legs and threatened her. In these factual scenarios he contends the prostitutes were not unlawfully restrained when he committed the sexual batteries and the jury should have been aware of the option to convict him of misdemeanor, rather than felony, sexual battery.

To say that we must view the evidence in the light most favorable to defendant is not to say we must engage in speculation or accept far-fetched inferences from the

evidence before us. A.D. testified that defendant's demeanor changed as they were driving to a secluded place, and by the time he touched her breast he had threatened her by declaring he could do it the hard way or the easy way. Given his size advantage, his angry demeanor, his threats, and A.D.'s belief that there was a bat in the backseat, the overwhelming evidence is that defendant had unlawfully restrained her by the time he touched her breast. Even a police officer's account that A.D. had told him the touching was the first sexual act did not establish that the touching took place before he began threatening her. The officer also testified that defendant had pulled her pants down before he demanded to see her breasts. Defendant's argument is predicated, therefore, not on the victim's testimony, but on a rather tenuous inference to be drawn from a hearsay statement. We do not believe this possible inference constitutes substantial evidence necessitating a lesser included offense instruction.

Nor was the evidence any more substantial with respect to Amanda. Again, defendant pieces together a hypothetical sequence of events at odds with the victim's testimony. It is true that Amanda did not even remember the touching. But she was quite definite that defendant pulled out a knife as they passed a blue sign, well before the sexual assault began. Defendant spins Detective Hendricks's testimony in his favor, but as we recounted above, he misread the record and urges an interpretation of her testimony at odds with the context in which it was provided. A fair reading of the record suggests that the battery occurred along with all the other sexual offenses once defendant parked the van and raped, sodomized, and digitally penetrated her. To aggrandize the mere mention that her cell phone fell out when she lifted her bra as enough evidence that Amanda had not been unlawfully restrained until a few minutes later is to enlarge the duty to instruct sua sponte on lesser included offenses when there is *any* evidence rather than *substantial* evidence. In our view, there simply is no substantial evidence to support the rather outlandish claim that defendant had not controlled these young girls by words,

30

acts, or authority and deprived them of their liberty when he touched their breasts. Thus, there was no duty to instruct on misdemeanor sexual battery.

III

*Prosecutorial Misconduct*

**A.     Rebuttal Argument on Beyond a Reasonable Doubt**

Defendant accuses the prosecutor of misconduct by distorting the beyond a reasonable doubt standard in his rebuttal argument. Prosecutorial misconduct deprives a defendant of due process under the federal Constitution when it comprises a pattern so egregious that it infects the trial with fundamental unfairness. Conduct that does not render the trial fundamentally unfair constitutes prosecutorial misconduct under state law if it involves the use of " ' " 'deceptive or reprehensible methods.' " ' " (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) While a prosecutor is accorded considerable latitude in arguing the legal and factual merits of his or her case, it is improper to misstate the law. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.) "In particular, it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*Ibid*.) "Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Samayoa*, at p. 841.)

Before counsel delivered their closing arguments the trial court instructed the jury on the intricacies of proof beyond a reasonable doubt. The court stated, in pertinent part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

31

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.

"Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

The prosecutor gave an impassioned opening argument synthesizing the theme of his case. He told the jury: ". . . Patrick Enloe is a predator on the prowl. He's not going to go after the soccer mom from Carmichael. He is not going to go after the CEO of a Fortune 500. No, he is going to go after the weak and the vulnerable, those who reside in the underbelly and the fringes of society, the weak and the prostitutes, those that don't like law enforcement and don't deal with law enforcement, that don't have credibility in [the] eyes of the common man. They are prostitutes; they are whores; and streetwalkers. Those are the people he is going to prey upon because they are easy targets. He is a wolf in sheep's clothing, and he is a predator on the prowl, and that's what he did in this case."

Without a mention of the beyond a reasonable doubt burden of proof, the prosecutor concluded: "And so now at the end of this trial, after you have seen all the evidence in the case, I propose to you this: Patrick Enloe is a serial rapist who raped not one, not two, not three, but four different women. He preyed upon their weaknesses. He preyed upon their vulnerability. And I pray that you find the truth in this case and render justice."

Defense counsel, however, discussed the prosecution's burden of proof at some length. She explained to the jurors: "The burden that the district attorney has to meet here is the highest burden we have in the law. It's higher than the probable cause which law enforcement needs to arrest somebody. It's higher than sort of a preponderance of the evidence, if we were talking about money or a contract legal dispute, that would be the -- what the prosecution would have to meet. It's not even what CPS would need, the

32

level that CPS would need to take Amanda's kids, for example. They would need clear and convincing proof. That is not even as high as reasonable doubt.

"Reasonable doubt is higher than that because we are talking about a person's life and liberty. And it's important when charges like this are made; it's significant because it impacts them for the rest of their lives, and you have to take it seriously. And there may be a few of you going, gosh, you know, they lied, but I just can't decide; I don't know. I think there's too much evidence kind of going both ways. I don't really know. Well, that means not guilty. If it's sort of a wash, that's a not guilty. If there's a few of you who go and say, well, I think he probably did this, some version of what the girls are saying, that's not guilty, too. And if you think, well, maybe he did it or it's likely he did it, that's still not guilty. That is not proof beyond a reasonable doubt."

In rebuttal, the prosecutor tiptoed into territory populated with landmines. Responding to defense counsel's suggestion that proof beyond a reasonable doubt is so high as to be rarely attainable, the prosecutor began by parroting the instruction the court had already given: "Reasonable doubt. Let's discuss that a little bit because the defense brought it up. It is proof that leaves you with an abiding conviction that the charges are true. The evidence need not eliminate all possible doubt, because everything in life is opened [*sic*] to some possible or imaginary doubt."

He then attempted to make the illusive standard more concrete. Defendant asserts the prosecutor misstated the law and improperly denigrated the beyond a reasonable doubt standard of proof. The prosecutor explained: "You must impartially and fairly consider all the evidence received throughout the trial. A reasonable doubt is a doubt based upon reason, logic and common sense. That is reasonable doubt. Let me give you an example of what it is and what it isn't. You see a pen in my hands, for you folks in the box. You saw the pen leave my hand. You saw it tumble through the air and heard it hit the floor. Now, it's possible that there is a crack in the floor and the pen is sitting on the third floor of this courthouse. It's possible that somebody crawled out from underneath

33

the table and grabbed the pen and crawled back. These are all possibilities. But are these based upon reason, logic and common sense? Or is it beyond a reasonable doubt that the pen is sitting where it left my hand and is on the floor and that's where it is."

After the court overruled a defense objection to his argument, the prosecutor concluded his discussion of reasonable doubt as follows: "In every state across our land people are convicted of the same standard. It is the highest standard of the land and rightfully so, but it is a standard that is not unobtainable. It is based upon reason, logic and common sense. If you go back into the jury room, and you are sitting there, and you're thinking there, you know, I just got this funny feeling in the pit of my belly, and I can't put it into words. I can't pin it to a particular piece of evidence or articulate, but I have a funny feeling in the pit of my belly, you know what I'm going to ask you to do? I'm going to ask you to share that funny feeling with your fellow jurors. You have an obligation to deliberate and obligation to talk. Share that funny feeling with your fellow jurors.

"And I tell you this: If you are unable to articulate that funny feeling and not able to point to certain evidence, logical evidence, then that funny feeling is not a reasonable doubt because if it was based upon reason, logic and common sense, you would be able to articulate, you would be able to put it into words and be able to point to certain evidence.

"Now, there are things in life that we do not have answers to. When we look at our spreadsheet or a spec, we expect all the numbers -- the numbers to line up and expect everything to be perfect, whether you be [*sic*] an engineer or accountant or whatever. But in life not everything is perfect.

"If you look at this, we don't have all the letters up here. We don't have certain letters. We don't have all the answers in this case, why somebody did this or that. But the fact of the matter is, even though we don't have certain letters and certain answers, is

there any reasonable doubt that what this spells is the defendant is guilty?  And that's the same thing in this case."

The question thus posed is whether it is reasonably likely that the jurors construed the prosecutor's rebuttal remarks in a way that impermissibly redefined or denigrated the burden of proof.  Defendant raises two objections to the prosecutor's argument:  1) the prosecutor improperly suggested that a reasonable doubt can only be based on reason, logic, and common sense, and 2) he trivialized the burden of proof with his pen-dropping analogy and his comment that the reasonable doubt standard is used to convict defendants on a daily basis.  We conclude there is no reasonable likelihood the prosecutor's remarks, when taken in context, including the fact the jury was properly instructed by the court and defense counsel, misled or were construed by the jury in an improper manner.

The prosecutor did encourage the jury to base its verdict on a reasoned evaluation of the evidence, but he did not misstate the beyond a reasonable doubt standard when he urged the jury to utilize "reason, logic and common sense" during deliberations.  Indeed, we expect them to do nothing less.  (*People v. Venegas* (1998) 18 Cal.4th 47, 80 [jurors will "rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them."].)  We reject defendant's tortured construction of the argument.  The prosecutor did not, as defendant suggests, remove the subjective element of the reasonable doubt standard or prohibit the jurors from factoring in how they felt.  Rather, in context, he warned them not to rely on a "funny feeling" alone.  To the contrary, he drew attention to the possibility of a gut feeling that a juror should bring into the deliberations and discuss with the other jurors.  Nor did he convey the false notion that a reasonable doubt must be based on affirmative evidence.  Again, in context, the prosecutor argued that a juror should be able to articulate doubts based on the state of the evidence, whether that is based on a complete lack of evidence or the unconvincing nature of the evidence presented.  We agree with the Attorney General that it is not reasonably likely the jury interpreted the prosecutor's remarks to mean that defendant had

35

the burden of producing evidence to prove his innocence, which would have been at odds with everything else they had been told.

Defendant offers examples where a prosecutor trivializes the reasonable doubt standard by analogizing them to everyday decisions like changing lanes or getting married. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 35-36.) But that is not what the prosecutor did during his rebuttal. The prosecutor acknowledged that the beyond a reasonable doubt standard is rightfully the highest standard of proof in the country. But to demonstrate that the standard is not unobtainable, he simply pointed out the true fact that people are convicted in every state in the nation under this rigorous standard of proof. Thus, rather than trivializing the standard, he actually paid homage to its rigor, while at the same time tempering the impression the jury might have derived from defense counsel's closing argument that proof beyond a reasonable doubt was nearly impossible to achieve. His argument in no way implied that convicting a defendant of crimes beyond a reasonable doubt was comparable to "every day" decisions (*ibid.*) or in any other way improperly trivialized the standard of proof.

The pen-dropping analogy may or may not have been clear, apt, or effective, but again we conclude it did not denigrate the standard of proof. At a minimum, it is subject to different interpretations. The Attorney General asserts the prosecutor was attempting to coach the jurors on their ability to use circumstantial evidence to reach the requisite standard of proof. Defendant insists the analogy had nothing to do with circumstantial evidence but with the prosecutor's admonition to the jurors to articulate the basis for their doubts and, using "reason, logic and common sense," point to specific evidence to support their doubts.

We do not believe defendant's argument is a fair representation of the meaning of the simple pen-dropping stunt. In context, the prosecutor was reiterating the point that there are always going to be remote, highly unlikely possibilities that could conceivably happen, but the mere existence of those possibilities does not constitute reasonable doubt.

36

Rather, according to the prosecutor, if jurors employ reason, logic, and common sense, they can find guilt beyond a reasonable doubt even in the face of hypothetical counterpossibilities. Thus, the argument does not trivialize the reasonable doubt standard; it merely provides a simplistic application of a well-worn principle.

## B.        Prostitutes as Victims and Witnesses

As he pointed out in his closing argument, prosecutors do not choose their victims, and when the victims are prostitutes, they can be flawed witnesses. That was certainly the case here. Four very young prostitutes, three of whom had drugs in their systems when tested and all of whom lied repeatedly to the police, accused defendant of a wide array of sexual offenses. Yet they were the only witnesses to the crimes, and the prosecution's case depended on their credibility and the jury's willingness to believe their eyewitness accounts despite the false and inconsistent statements they provided police when reporting the crimes. As expected, the prosecutor spent considerable energy attempting to rehabilitate his witnesses and urging the jurors to suspend their biases against those who resided in the underbelly of society.

Defendant asserts the prosecutor went too far and crossed the outermost boundary for permissible advocacy by implying that the jury instructions prohibited jurors from devaluing the testimony of prostitutes on account of their profession and by vouching for their credibility based on evidence that does not appear in the record. A fair reading of the record belies these claims.

The prosecutor did not imply the jury instructions prohibited jurors from using prostitution as a factor in assessing credibility. Rather, the prosecutor alerted the jurors to the possibility that they might be biased against the victims solely on the basis of the kind of work they did. He expressed his grave concern that he could find 12 unbiased jurors who would carefully consider the content of the victims' testimony and not discard the testimony entirely because the victims had chosen a "dirty" lifestyle. He argued: "But at some point in your life you have to just give in and trust. You have to trust that a group

37

of 12 ordinary people are going to evaluate the testimony of a witness in the context of the entire case, that you're going to take that testimony and see if what is stated is corroborated by other evidence; trust that you're not going to just discard a human being because of the profession that they chose; trust that the human spirit and the human wisdom will rise above our prejudices, our biases. And so I trust you folks to do that, to find the truth." There was nothing improper about highlighting the potential for bias, and there was nothing implicit in that warning to prevent the jurors from examining all aspects of the witnesses' credibility, including their involvement with prostitution both before and after defendant raped them.

Finally, defendant complains that the prosecutor relied on facts not in evidence to rehabilitate his witnesses. He is right on the law and wrong on his characterization of the argument. It is true that a " 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.) But prosecutors have wide latitude in discussing the veracity of the testimony based on the evidence at trial and, more importantly, to draw reasonable inferences from that evidence. (*Id*. at p. 432; *People v. Lucas* (1995) 12 Cal.4th 415, 473.) The prosecutor did nothing more than point out the obvious inferences the evidence suggests.

Defendant objects to arguments such as, "These prostitutes, they weren't born with much. They weren't given much, and, frankly, they don't even have much. They sell their body over and over again and their dignity for what? Money." Defense counsel chastised the prostitutes for their profession and for all the lies they told, and urged the jury to disregard their testimony. Thus, in rebuttal, the prosecutor tried once again to rehabilitate his witnesses. He argued: "What about a new profession? Yes, these women continued to prostitute themselves. Amanda continued to prostitute herself. Ashley continued to do it. [A.D.] continued to do it. Yes, [A.D.] did say it was easy money, but they left out the other part of what she said. It's easy money; I got to support

my children. I've got to. These women, they weren't born with much. Amanda was in foster care. They weren't given much. They don't have much. They weren't born with a father playing golf at the country club. They didn't go to a private school. They weren't at a UC school. They don't have a whole lot of skills and, yes, they have choices. Nobody made them prostitute themselves. They made those choices. But they made those choices that were the best choices for their children and their family, and it shouldn't be held against them."

Indeed, all three prostitutes testified they continued to prostitute themselves to survive or to take care of their children after defendant raped them. Amanda testified she had been in foster care. All of them, as the prosecutor argued, were willing to sell their bodies for small sums of money to buy diapers, pay for a room, or just survive. Because a prosecutor is accorded wide latitude in arguing the evidence, we cannot say he committed misconduct by inferring these young prostitutes had not been born with many financial resources and that they lacked skills, education, and privileges accorded those of a higher socioeconomic class. These were all fair inferences to be drawn from their testimony, their appearance, and their vocabularies. The evidence supported the prosecutor's argument, and we reject defendant's accusation that it was improper.

## IV

### *Inadequacy of Counsel*

Defendant was found guilty of digital touching and sexual battery based on Amanda's prior statement to Detective Hendricks. Although at trial she was able to describe the details of the rape, oral copulation, and sodomy, Amanda did not recall specifically whether or not defendant had touched her breast or digitally penetrated her. Defendant contends he was denied his constitutional right to effective assistance of counsel because his lawyer failed to object to the admission of the hearsay evidence. His burden to establish ineffective assistance of counsel is a heavy one.

39

"[D]efendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics."  (*People v. Floyd* (1970) 1 Cal.3d 694, 709, disapproved on another point in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36..)  A claim of ineffective assistance of counsel is cognizable on direct appeal only if " 'there simply could be no satisfactory explanation' [citation] . . . ."  (*People v. Haskett* (1990) 52 Cal.3d 210, 248.)  Defendant argues that there could not be a solid tactical reason for failing to object to the hearsay testimony, particularly when, as here, the prior statement constituted the only evidence to support the charges.

Defendant assumes that a hearsay objection would have been sustained.  If, as the Attorney General argues, the prior statement was admissible as a past recollection recorded pursuant to Evidence Code section 1237, it was certainly reasonable for defense counsel to refrain from objecting.  Section 1237 provides:  "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

"(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement.

"(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party."

Defendant argues in reply that Amanda's prior statement was not admissible pursuant to Evidence Code section 1237 because Amanda had lied to Detective Hendricks. *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*) provides otherwise.

In *Cowan*, a witness who was in custody at the time he gave his statement to a police officer and hoped it would help him "get out of jail" told the officer about his personal involvement in the trade of a weapon. (*Cowan*, *supra*, 50 Cal.4th at p. 466.) But he later admitted that he might have lied about his involvement. (*Ibid.*) The defendant argued the statement was inadmissible pursuant to Evidence Code section 1237 because the witness could not reliably vouch for its truthfulness. (*Cowan*, at p. 466.) The Supreme Court held in effect that lack of truthfulness regarding one part of a statement did not automatically render the entire statement inadmissible. The court pointed out that the only subject about which the witness might have lied was "his involvement in the gun transaction, which was not the subject of the portion of [the witness's] statement the prosecution sought to introduce, and when confronted with the inconsistency between his 1984 and 1994 statements on the subject [the witness] forthrightly admitted he might have lied in 1984." (*Id.* at p. 467.)

In nearly copycat fashion, defendant makes the same claim. Amanda, like the in-custody witness in *Cowan*, admittedly lied to Detective Hendricks. But her lies, like those the witness told in *Cowan*, did not pervade her statement. Not surprisingly, she hid the fact that she was engaged in prostitution at the time she got into defendant's van, and to do so, she concocted a fable about a phantom person and the reason she was on the street. But those deceptions, like the lie told in *Cowan*, did not render the entire statement inherently unreliable and untrustworthy. While her motive to hide her involvement in prostitution is obvious, there is no reason to disbelieve her description of the events that transpired inside the van. Thus, the fact that a part of the statement was untruthful does not disqualify the entire statement as a prior recorded statement under Evidence Code section 1237.

Moreover, the statement met the other parameters established by the statute. Having given the statement three days after the sexual assault, the writing was made at a time when the events were fresh in the witness's memory. (Evid. Code, § 1237, subd. (a)(1).) Amanda made the statement for the purpose of Detective Hendricks recording it. (§ 1237, subd. (a)(2)(ii).) She testified that she told Detective Hendricks the truth, despite the fact that she no longer remembered whether defendant had touched her breast or digitally penetrated her. (§ 1237, subd. (a)(3).) And the detective authenticated the statement at trial. (§ 1237, subd. (a)(4).) Because it apparently qualifies under the prior recorded statement exception to the hearsay ban, trial counsel reasonably concluded an objection would be futile. Or, at a minimum, she might have decided that such a facially weak objection would be tactically inadvisable. Either way, defendant cannot sustain his burden of demonstrating there could be no satisfactory explanation for foregoing an objection to the evidence. As a result, his ineffective assistance of counsel claim fails.

## V

### *Sentencing*

Defendant argues that his convictions for sexual battery and forcible sexual penetration against A.D. and for oral copulation and forcible sexual penetration against Amanda must be stayed pursuant to Penal Code section 654 because those offenses were the means of, facilitated the commission of, or were merely incidental to the commission of rape. We disagree.

"[S]ection 654 does not apply to sexual misconduct that is 'preparatory' in the general sense that it is designed to sexually arouse the perpetrator or the victim. (*People v. Madera* [(1991)] 231 Cal.App.3d [845,] 855 [(*Madera*)].) That makes section 654 of limited utility to defendants who commit multiple sex crimes against a single victim on a single occasion. As our Supreme Court has stated, '[M]ultiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses

42

are generally "divisible" from one another under section 654, and separate punishment is usually allowed. [Citations.]' (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6 [36 Cal.Rptr.2d 627, 885 P.2d 1040] [(*Scott*)].) If the rule were otherwise, 'the clever molester could violate his victim in numerous lewd ways, safe in the knowledge that he could not be convicted and punished for every act.' (*Id.* at p. 347.) Particularly with regard to underage victims, it is inconceivable the Legislature would have intended this result. (*Ibid.*)" (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*).)

Our focus is whether the evidence demonstrates the defendant "independently sought sexual gratification each time he committed an unlawful act." (*Scott*, *supra*, 9 Cal.4th at pp. 347-348, fn. 9.) Because this determination is ultimately a question of fact, we review the record to determine whether there is substantial evidence to support the trial court's implied findings that defendant sought sexual gratification as he committed each offense. (*People v. Arndt* (1999) 76 Cal.App.4th 387, 397.)

There is substantial evidence to support the trial court's implied factual finding that defendant was seeking sexual gratification when he put mucus on his finger and digitally penetrated A.D. He did not merely use the mucus as lubricant and immediately rape her as dicta in *Madera*, *supra*, 231 Cal.App.3d at pp. 854-855 hypothesizes. Rather, he digitally penetrated her and then masturbated. Similarly, he demanded that she show him her breasts, and he groped a breast while masturbating. Thus, the discrete and independent acts of forcible sexual penetration and sexual battery were designed to gratify his sexual desires separate and apart from his ultimate act of gratification—the rape.

In the same way, the oral copulation of Amanda was not incidental to the rape despite defendant's demand "to suck his private area until [she] got him hard." As noted above, Penal Code section 654 does not apply to preparatory conduct that is designed to sexually arouse the perpetrator. (*Alvarez*, *supra*, 178 Cal.App.4th at p. 1006.) Amanda's testimony suggests that defendant forced her to orally copulate him to achieve sexual

43

arousal, and thus section 654 does not preclude punishment for oral copulation and rape. Additionally, he proceeded to put his fingers into her vagina, then put his penis into her vagina, then into her anus, and finally back into her vagina. The court could reasonably infer that each act escalated his gratification and he was willing to perform separate independent acts until he was ultimately satisfied. There is substantial evidence to support the trial court's implied finding that he achieved sexual gratification from each independent act, and section 654 presents no bar to sentencing for each count.

## DISPOSITION

The judgment is affirmed.


       RAYE       , P. J.


We concur:


       HULL       , J.


       MURRAY       , J.