[No. F057896. Fifth Dist. Sept. 8, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY IRELAND, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 3.–7. of the Discussion.

COUNSEL

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lloyd G. Carter and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DAWSON, J.—Following a jury trial, Anthony Ireland (appellant) was convicted of four counts of forcible rape (Pen. Code, § 261, subd. (a)(2)).[1] As to each count, the jury found true the allegations that appellant used a deadly weapon (§ 12022.3, subd. (a)) and that he committed the crimes against multiple victims and with a deadly weapon (§ 667.61, subd. (e)(4), (5)). The trial court sentenced appellant to a total term of 100 years in state prison, consisting of four consecutive 25-year-to-life terms.

On appeal, appellant contends (1) there is insufficient evidence to sustain his forcible rape convictions; (2) CALCRIM No. 1000 as given was insufficient; (3) CALCRIM No. 250 was given in error; (4) the trial court erred in failing to instruct on assault and battery as lesser included offenses; (5) the trial court erred in admitting evidence of an uncharged act; (6) CALCRIM Nos. 1191 and 2916 were given in error; and (7) trial counsel was ineffective. We find no prejudicial error and affirm.

## FACTS

Each of appellant's four convictions of forcible rape involved a different victim but a similar scenario.

*Count 1: V.B.*

In late October of 2007, V.B. was working as a prostitute on Motel Drive when appellant, in a four-door burgundy car, approached and asked her for a "date," which she described as an agreement to have sex for an agreed-upon amount of money. The two agreed on a price of $40. V.B. suggested they go to her motel room but appellant declined, saying he had once been robbed in

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

a motel room. He suggested they drive down the street and park, and V.B. agreed. They parked in a driveway near railroad tracks.

Appellant told V.B. to get into the backseat of the car, which she did. When appellant entered the backseat, V.B. felt a metal knife against her neck. V.B. began to cry and begged appellant "please don't hurt me." V.B. testified she was afraid and did not want to die. Appellant told her to be quiet and that he would not hurt her if she cooperated. V.B. was afraid that, if she resisted, appellant would cut or stab her.

Appellant then had vaginal intercourse with V.B., while holding the knife to her throat. V.B. described the knife as a big butcher knife with a seven-to-nine-inch blade and a wooden handle. Appellant told her to make noises like she enjoyed the sex act, but instead she cried "loudly" the entire time. After appellant ejaculated, he exited the car and threw the condom he was wearing into the bushes. When V.B. asked if she could leave, appellant said yes. V.B. then exited the car and ran. Appellant did not pay her.

V.B. had never met appellant prior to the incident. She did not consent to the sexual act as it happened, and she did not agree to the use of the knife when she got into the car. V.B. did not report the incident to the police at first, because she was a prostitute.

*Count 2: J.W.*

In late September or early October of 2007, J.W. was working as a prostitute when appellant, in a four-door burgundy car, pulled up next to her and asked for a "date." J.W. was tired and ready to go home, so she quoted him a $100 price, thinking he would not agree to it. But appellant agreed to the price, and J.W. got into the car. J.W. told appellant she had a motel room, but he said he had a bad experience in a motel room, and they instead drove to a location five minutes away and parked.

The two agreed to have sex in the car, so J.W. climbed into the backseat. Appellant got out of the driver's seat and walked to the back. When he opened the back door, J.W. asked him for her money. Appellant said, "oh, oh, yeah," reached toward the waist of his pants, and pulled out a large knife with a 10-inch blade.

Appellant got into the backseat and on top of J.W. and held the knife to the side of her neck. When J.W. asked appellant what he was doing, he told her to "shut up." J.W. felt that appellant had an erection and asked him to put on a condom. He told her to put it on him. J.W. was afraid appellant might "slice

[her] neck off." She asked appellant not to hurt her. She cooperated because she was fearful she might die.

Appellant held the knife to J.W's throat the entire time. She was very frightened and asked appellant to remove the knife from her neck. But appellant said "no" because " 'you might scream.' " He told her not to scream or make any sudden movements or he would use the knife. J.W. did not scream, because she was afraid appellant might stab her in the neck.

Appellant had sex with her. After he ejaculated, he got out of the car and threw the condom on the ground. He did not pay her. J.W. never agreed to have sexual intercourse with appellant while he held a knife to her throat.

J.W. did not report the incident to the police, but she did tell others on the street about the incident. After the incident, she saw appellant in his car at a liquor store. She yelled at him to leave and told other women in the area, "that's him, don't get in his car."

J.W. was later contacted by the police and asked if she knew anyone bothering the women in the area. She related to them what had happened to her.

## Count 3: A.H.

In October of 2007, A.H. was working as a prostitute when appellant, in a red four-door car, pulled up and asked her for a "date." They agreed on $60. A.H. got into appellant's car and they drove to a cemetery and parked.

Once there, they both got out of the car and A.H. got into the back-seat. A.H. told appellant she needed her money. He told her she would get it but, when he got into the backseat, he put a big kitchen knife to her throat. A.H. said "no," but appellant held the knife to A.H.'s throat, told her to put a condom on him, and then told her to remove her pants and get on her knees. She complied because she was afraid he was going to kill her. She didn't say anything else because she was too afraid. Appellant then had vaginal intercourse with her, after which she got out of the car and left. Appellant did not pay her.

A.H. had never met appellant before the incident and did not agree to the use of the knife. She did not report the incident because she had been "hurt" when she was younger and the police had done nothing about it. Here, she was later contacted by police and told them what had happened.

## Count 4: C.S.

In November of 2007, C.S. (sometimes known as Baby), who was 15 years old at the time, was working as a prostitute when appellant, in a four-door

burgundy car, asked her for a "car date." They agreed on $80. C.S. suggested they go to a hotel, but appellant suggested they drive to a cemetery, and C.S. agreed.

Once there, C.S. got out of the car, got into the backseat, and asked appellant for her money. Appellant acted as if he were going to get the money from his pocket but, instead, pulled out a large knife with an eight-to-10-inch blade from the front of his pants. Appellant put the blade to C.S.'s neck and said, "do what I say and you won't get hurt." She was "shocked" and "scared" that she might die. She requested that he use a condom, and appellant complied. Appellant then had vaginal intercourse with her. He held the knife to her throat the entire time. C.S. did not agree to the use of the knife, but she thought appellant would cut her if she did not comply. After the incident, C.S. asked appellant for a ride back and he agreed. Appellant did not pay her.

About a week later, C.S. was on the street when she was contacted by police because it was late and she looked young. One of the officers mentioned there had been rapes in the area. C.S. described what had happened to her and gave the officer a description of appellant, his vehicle, and the assault.

*Police Investigation*

In November of 2007, Detective Neal Cooney, a sexual assault investigator, received information from another officer informing him of sexual assaults on female prostitutes. The description of the assailant, his vehicle, and his modus operandi were similar.

On November 6, 2007, while conducting surveillance, Detective Cooney struck up a conversation with J.W., who was walking the street. She explained she had been raped at knifepoint a few weeks earlier. Her description of the suspect was similar to that already received.

Later that evening, Detective Cooney observed a vehicle that fit the suspect's vehicle description. Detective Cooney initiated a traffic stop. Appellant was the only occupant of the vehicle. Appellant consented to a search, but told Detective Cooney that he had a knife on his right side. Cooney removed the knife from appellant's waistband and arrested appellant.

V.B., J.W., and A.H. subsequently identified appellant in a photographic lineup as the man who raped them.

Detective Cooney and another officer interviewed appellant at the police station. The interview, which was recorded, was subsequently played for the

jury during trial. Appellant told the officers he carried a butcher knife for protection. He also said he had had sex with three or four prostitutes, whom he subsequently described as one blonde, one Asian, and two Black females.

Appellant initially claimed all of the women consented to sex and that he used the knife with one, the blonde, because it turned her on. He denied putting it to her neck to hurt her but said he rubbed it on her body.

After further questioning, appellant admitted he used the knife on "Baby." Appellant told her he was going to use the knife, but she did not want him to do so. He then told her, "well I'm going to do it I was just like let me do it." After he promised he wouldn't kill her, she agreed. He claimed to put the knife to her breasts and her lower neck area.

Appellant then admitted he also used the knife on one of the Black women but said he quit when she became scared. When she said she did not want to do "it," he told her, "you already said you were going to do it . . . ." After they had sex, she jumped out of the car without taking any money.

Appellant then said he had had sex with another "black girl." He initially gave her money for sex. About halfway through the sexual act, appellant pulled out a knife. After they had sex, he took the money back from her.

Appellant stated that he also picked up a Hispanic woman and, while she was getting undressed, he pulled out the knife. When he asked her if he could use it, she told him to get off her and not to hurt her. She then jumped out of the car and ran.

Appellant also admitted he picked up a "white girl" a few days before Halloween and "use[d] a knife" on her.

When police asked appellant if he had any money on him when he picked up the women, he stated that he might not have had "the exact amount" and went on to add that he was afraid to tell the women because ". . . one she was just like, like what the f . . . are you doing . . . and I was just like you know whatever the case is like you know I knew that she, she was like was basically like thinking in her head like okay he is going to hurt me or something like that . . . ."

Appellant expressed remorse for putting the victims in fear and agreed to write a letter of apology to them. The letter, which was read to the jury, stated that appellant wanted to accept responsibility for what he had done. He claimed he did not intend to hurt any of the victims but acknowledged that he might have done so. He stated that he could not change what had happened in

the past, but he could make better decisions in the future. He stated, "Maybe it was because I got caught. Either way, I know that's what was best."

*Evidence Code Section 1108*

Pursuant to Evidence Code section 1108, the prosecution was permitted to introduce evidence of a prior uncharged incident committed by appellant. A woman, S.M., testified that, in September of 2007, she was taking a shower at home in Clovis. When she got out of the shower, she heard a noise outside and thought someone was touching the bars on the window. She saw a person wearing a hat, glasses, and black clothing, looking into the window. She called the police.

The officer who responded to the scene dusted the window and bars for fingerprints. He also located shoe prints in the dirt below the windows.

Appellant was found in the front yard of S.M.'s house. His shoes matched the imprint found by the windows. A fingerprint matched his left thumb. Appellant initially stated he was looking for a friend but later admitted looking into the window and seeing S.M.'s exposed breasts.

## DISCUSSION

1. *Sufficiency of the Evidence*

Appellant argues there is insufficient evidence to convict him of any of the forcible rapes. He specifically contends that each woman consented to engage in sex acts in return for money and, although each woman objected to the use of the knife, the use of that knife did not automatically terminate the consent. He claims there was insufficient evidence to establish that each woman withdrew her consent and communicated that withdrawal of consent to appellant. We disagree.

In determining whether the evidence is sufficient to support the verdict, we review the entire record, viewing the evidence in the light most favorable to the judgment and presuming in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence. The issue is whether the record so viewed discloses evidence that is reasonable, credible and of solid value such that a rational trier of fact could find the elements of the crime beyond a reasonable doubt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156 [32 Cal.Rptr.3d 759, 117 P.3d 476].)

Appellant was convicted of four counts of forcible rape within the meaning of section 261, subdivision (a)(2), which defines rape as an act of

sexual intercourse "[w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

Lack of consent is an element of the crime of rape. Consent is defined in section 261.6 as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." CALCRIM No. 1000, as given here, instructed that "[t]o consent, a woman must act freely and voluntarily and know the nature of the act."

"Actual consent must be distinguished from submission. [A] victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will. [Citation.]" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460, fn. 3 [98 Cal.Rptr.2d 315].)

Where the woman's lack of consent was uncommunicated and could not reasonably be detected, however, the accused may not be guilty of rape. It is a defense that the accused reasonably and in good faith believed the woman engaged in the act consensually. (*People v. Mayberry* (1975) 15 Cal.3d 143, 153–158 [125 Cal.Rptr. 745, 542 P.2d 1337].)

Here the jury was instructed: "Evidence that the woman requested [appellant] to use a condom or other birth control device is not enough by itself to constitute consent." (See CALCRIM No. 1000.) And: "[Appellant] is not guilty of rape if he actually and reasonably believed that the woman consented to intercourse. The People have the burden of proving beyond a reasonable doubt that [appellant] did not actually and reasonably believe that the woman consented." (See *ibid.*)[2]

Withdrawal of consent can occur at any time. (*In re John Z.* (2003) 29 Cal.4th 756, 762 [128 Cal.Rptr.2d 783, 60 P.3d 183].) Here the trial court gave the standard instruction on withdrawal of consent: "A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without

---

[2] During a discussion of jury instructions, the prosecutor argued this portion of CALCRIM No. 1000 was inapplicable to the facts of the case. Defense counsel argued that this portion of the instruction was applicable because appellant thought the victims agreed to the use of the knife. The trial court opined that it might be "unusual for someone to believe that's the case" and that, although it was a "very, very remote" possibility, it would allow that portion of the instruction to be read.

her consent if: [¶] One, she communicated to [appellant] that she objected to the act of intercourse and attempted to stop the act; [¶] Two, she communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] and Three, [appellant] forcibly continued the act of intercourse despite her objection." (See CALCRIM No. 1000.)

Appellant's argument is that each victim gave her consent to the sex act that was committed, that his use of the knife during the act did not automatically negate that consent, and that there was insufficient evidence that any of the victims communicated a withdrawal of consent to him. Respondent, on the other hand, contends the determinative question is not whether the victims communicated a withdrawal of consent. Instead, according to respondent, appellant's use of the knife, along with his express or implied threat to harm his victims if they did not cooperate, did automatically negate their previously given consent.

We agree with respondent's analysis. There is no doubt that, at the beginning of each encounter, each victim freely consented to intercourse. But as to each of the victims, appellant communicated the express or implied threat that, if they did not continue to cooperate even after he produced the knife and held it to their throats, he would do them harm. As to the victim V.B., the testimony was that appellant told her "just to cooperate" and she "won't get hurt." When the victim J.W. asked appellant what he was doing with the knife, he told her to " 'shut up.' " She did, because she was afraid he would otherwise "slice [her] neck off." He told her not to scream or make any sudden movements and he would not use the knife. When the victim A.H. reacted to appellant putting the knife to her throat by saying "no," appellant responded by instructing her to put a condom on his penis, remove her pants, and get on her knees. She complied because she thought he would otherwise kill her. To the victim C.S., appellant said "do what I say and you won't get hurt." She cooperated out of fear.

It is not appellant's position that there is insufficient evidence to show a lack of consent from each of the victims after appellant displayed his knife and threatened them. There is more than substantial evidence that each victim's continued participation in the sexual encounter with appellant was in fact nonconsensual after that point.

Instead, appellant's position is that because, as to each victim, consent had once been given, each victim was required not only to withdraw that consent but also to communicate that withdrawal to him—to communicate it, if not expressly, at least by implication. We disagree.

■ The essence of consent is that it is given out of free will. That is why it can be withdrawn. While there exists a defense to rape based on the defendant's actual and reasonable belief that the victim does consent (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148 [47 Cal.Rptr.3d 575, 140 P.3d 866]; *People v. Mayberry, supra*, 15 Cal.3d at pp. 153–158), we do not require that victims communicate their lack of consent. (See *People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1] [lack of consent need not be proven by direct testimony but may be inferred from use of force or duress].) We certainly do not require that victims resist. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1024–1025 [16 Cal.Rptr.3d 891, 94 P.3d 1089].) Yet this is what appellant proposes here. At the time of the offenses, appellant told his victims to cooperate or be hurt. Now he contends they were required to express to him their lack of cooperation. That cannot be the law. When appellant used the knife and expressly or impliedly threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent,[3] the previously given consent no longer existed, either in fact or in law. (Cf. *People v. Washington* (1962) 203 Cal.App.2d 609, 610 [21 Cal.Rptr. 788] ["[c]onsent induced by fear is no consent at all"].)

Furthermore, even were we to say that these victims were required to communicate their lack of consent to appellant, we would still find substantial evidence to support the convictions. V.B. testified that she never agreed to have sex with appellant with a knife held to her neck. When appellant pressed the knife to her throat, she was afraid and began to cry. She told appellant "please don't hurt me, don't hurt me." J.W. testified that, when appellant put the knife to her neck, she asked him what he was doing and asked him to move the knife. Appellant told her to "shut up" and refused to put the knife down because he thought she might scream. A.H. testified that she said "no" when appellant put the knife to her throat. C.S. testified she was "shocked" and "scared" she might die, and that appellant told her to "do what I say and you won't get hurt." In his confession, appellant stated that C.S. told him she did not want him to use the knife.

From all of this evidence, it is clear that these victims did not continue to consent when appellant put the knife to their throats and that appellant knew they did not continue to consent. Thus, if they were required to communicate a withdrawal of consent, they adequately did so.

Substantial evidence supports each of the convictions of forcible rape, and we reject appellant's claim to the contrary.

---

[3] Appellant does not argue that the record includes any such evidence.

## 2. CALCRIM No. 1000

Appellant contends that CALCRIM No. 1000, as given, was deficient on the issue of "withdrawal of consent." Respondent argues, first, that appellant forfeited his right to appellate review by failing to make a request that the trial court modify the instruction and, second, that, even if the instruction as given was error, it was harmless. We agree the failure to make a request to modify the instruction as given generally forfeits the right to appellate review, but we nonetheless examine the issue and find no prejudicial error. (*People v. Alvarez* (1996) 14 Cal.4th 155, 222 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Johnson* (1993) 6 Cal.4th 1, 52 [23 Cal.Rptr.2d 593, 859 P.2d 673], abrogated on another point in *People v. Rogers* (2006) 39 Cal.4th 826, 878–879 [48 Cal.Rptr.3d 1, 141 P.3d 135].)

As noted in part 1., *ante*, the jury was instructed, pursuant to CALCRIM No. 1000, on the issue of consent and withdrawal of consent, as follows: "To consent, a woman must act freely and voluntarily and know the nature of the act. [¶] A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] One, she communicated to [appellant] that she objected to the act of intercourse and attempted to stop the act; [¶] Two, she communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] and Three, [appellant] forcibly continued the act of intercourse despite her objection."

Appellant argues the instruction, as given, incorrectly implied that the "rules governing withdrawal of consent appl[y] only during the act of sexual intercourse," and not before. According to appellant, this instruction erroneously limits the withdrawal of consent requirement to the situation where the woman withdraws her consent during intercourse and the jury would therefore not understand that the requirement that the woman must communicate her withdrawal applied to a "pre-penetration withdrawal of consent as well."

As noted by appellant, in *People v. Vela* (1985) 172 Cal.App.3d 237, 242 [218 Cal.Rptr. 161], the court held that consent to sexual intercourse could be withdrawn before penetration but not after. In *In re John Z., supra*, 29 Cal.4th 756, 763, our Supreme Court disagreed with that particular point in *Vela* and held that a woman could withdraw her consent to sexual intercourse at any time, even during copulation, as long as that withdrawal was clearly communicated. Appellant contends that the instruction, as given here, "preserves the artificial boundary line that was rejected in *John Z.*" and "repeats the same error of *Vela*, only in reverse." In other words, appellant contends that the

instruction limits the rule to a situation where the woman withdraws her consent after penetration and it implies that there is no requirement that a woman communicate withdrawal of consent prior to penetration.

Appellant further contends the instructional error was compounded by the prosecutor's argument that (a) the instruction on withdrawal of consent was inapplicable because "that knife came out prior to any [penetration]" and (b) appellant's display of the knife before penetration automatically rendered the intercourse nonconsensual without any requirement that the women communicate their withdrawal of consent.

We agree with appellant that the instruction on withdrawal of consent could have been confusing. But as we have concluded in part 1., *ante*, there was no evidence presented that any of the victims here ever consented to having sexual intercourse with a knife held to her throat. It was clear from the words and actions of each of the victims that they did not consent to such an act—that is, they had withdrawn their previously given consent. In the circumstances of this case, no further communication of that withdrawal was required. Thus, appellant's apprehension that the jury interpreted the instruction given as drawing a distinction between pre- and postpenetration withdrawal of consent is immaterial.

And even if the instruction as given was error, it was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Besides instructing that the prosecution must prove the victim did not consent, the trial court also instructed that the prosecution had to prove that appellant "did not actually and reasonably believe that the woman consented." (See CALCRIM No. 1000.) We must presume that the jury followed this instruction (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1336 [71 Cal.Rptr.2d 41]), and thus we must conclude that the jury had no reasonable doubt that appellant knew his victims either did not consent or had withdrawn their consent.

No prejudicial error occurred.

3.–7.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 328.

## DISPOSITION

The judgment is affirmed.

Cornell, Acting P. J., and Poochigian, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 2010, S187457. George, C. J., and Werdegar, J., did not participate therein.