Filed 8/12/15  People v. Davidson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RYAN DAVIDSON,<br><br>    Defendant and Appellant. | D064880<br><br><br>(Super. Ct. No. SCD236535) |

APPEAL from a judgment of the Superior Court of San Diego County, Margie G. Woods, Judge.  Affirmed as modified.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

Ryan Davidson appeals from a judgment convicting him of torture, corporal injury to a cohabitant, and criminal threats.  He contends the judgment must be reversed because

(1) his counsel abandoned him by arguing against him in closing arguments, and (2) the trial court failed to adequately instruct on consent principles. We reject these contentions of reversible error.

Defendant also asserts he was improperly ordered to pay a domestic violence fund fee that applies when a defendant is granted probation. As conceded by the People, the fine was improper because defendant was sent to prison, not granted probation. We modify the judgment to strike the domestic violence fund fee. As so modified, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges in this case arose from defendant's highly assaultive conduct on his girlfriend (CC) over a period of several months. On September 13, 2011, CC fled from defendant and reported the domestic violence to a neighbor, her family, emergency room personnel, and police, including during a recorded interview. By the time of trial, CC had recanted, claiming she consented to the infliction of injuries as part of a consensual BDSM (bondage, dominance, sadism, and masochism) relationship with defendant. The trial court instructed on the defense theories of accident and reasonable belief in consent. The jury rejected the defense claims and found defendant guilty.

Defendant and CC started dating in 2008 and shortly thereafter defendant moved in with CC. CC's roommate, who rented the upstairs area of her home to CC, testified she sometimes heard a lot of yelling, screaming, arguing, bumping, pounding, slapping, and things being thrown from CC's portion of the house. She heard defendant and CC arguing more frequently in about April 2011, and again in September 2011, and during

2

this period they started "more and more . . . keeping to themselves." In the days before September 13, 2011, she heard defendant say in an irate voice, " 'I can't understand why I have to keep telling you this over and over and over.' " CC's parents testified they noticed bruises on CC's face, neck, and arm during this timeframe, and CC variously said they were caused by a fall or because she had " 'cheated' " on defendant.

On September 13, 2011, CC's neighbor and the neighbor's son were in their car when CC ran out of her residence and jumped into the back seat. CC was crying, frantic, and repeatedly screaming " 'Get me out of here.' " CC told them her boyfriend had been beating her with a flashlight; he had been beating her for hours; and he had threatened her family and friends. CC showed them her arms, which were covered in bruises.

When fleeing her residence, CC did not have her cell phone, purse or keys, and she used her neighbor's cell phone to warn people about defendant's threats. CC left a message telling her roommate not to come home. She told her parents to get out of the house " 'right now' "; defendant had her phone and her car; and he was going to kill them and all of her friends. CC's parents called 911 and fled their home.

Meanwhile, the neighbor assisted CC in contacting the police, and CC was transported by ambulance to the hospital. CC told the emergency room personnel her boyfriend had held her against her will for days and beaten her; he beat her with a flashlight, kicked her, and choked her; he hit her "multiple times in the same areas"; she was very afraid of him; and they had consensual sex but she wished "the domestic violence would just end." The emergency room personnel observed extensive bruising throughout her body, including on her face, neck, extremities, torso, abdomen, and pelvic

3

area; a perforated ear drum; two bite marks (on her leg and chest); and a previously stitched lip laceration. The emergency room nurse testified CC's bruising from her shoulders to her elbows was "solid black, which [the nurse had] never seen before"; her arms, hands and jaw were swollen; she had a "hard time moving"; and she complained of pain from "head to toe," including ear pain. The emergency room physician testified CC was "the most severely bruised alive individual" he had seen in his career; her injuries were from "some form of blunt force"; the bruising pattern was "consistent with injury that has occurred over time"; the bruises could have been incurred within 48 hours to one or two weeks earlier; and the extent of the bruising required evaluation for internal injuries including blood tests, X-rays, and CT scans.

CC provided details about what occurred during two police interviews, and the second interview was recorded. CC explained defendant was "emotionally unstable" and could "turn[] on a dime" if she "answer[ed] something wrong," and defendant's mother claimed he was bipolar. Defendant started hitting her in April 2011, and the assaults continued on and off in May, June, and August 2011. During the arguments he would hit her and then they would talk, he would apologize, and it would be "okay" until they had another fight. In May defendant hit her "really badly." He bit her on her cheeks, slapped her face, and choked her. When CC asked why he was hitting her, he would tell her she was hurting him " 'on the inside' "; she was not listening and it was her fault; and he wanted to help her be a better person. When they talked after their fights, they would have consensual sex, and she would ask herself how she could be intimate with someone

4

who was hitting and hurting her, but she always thought defendant loved her and really did want to help her.

The assaults that culminated in CC's escape on Tuesday, September 13 occurred on and off from Saturday to Tuesday. On Saturday defendant hit her with his fist, his shoe and a metal flashlight; kicked her; threw a bottle at her; choked her; hit her in the ears; and punched her in the stomach and vagina. When she told him to stop, he said, " 'You're begging me? I begged you to stop hurting me and now you are begging me and you want me to stop?' " She tried to deflect his blows by putting up her hands and covering her chest and abdomen, which would make him angrier and worsen the attack. Defendant told her, " 'I'm just gonna kill you. I'm gonna scoop your fucking eyes out of your head so you don't have to see the rest of the world. The rest of the world can just see how fucking ugly you are.' " At one point on Saturday he cut her lip "wide open." When she told defendant she thought she needed stitches, he took her to urgent care, where she told the staff that she had gotten into a fight with her "bipolar cousin."

Defendant became angry again on Sunday, and he kicked and punched her while she was in the shower. On Monday she called her boss and said she would be working from home on Monday and Tuesday. During a fight on Monday that lasted about two hours, defendant pushed, hit, and strangled her.

On Tuesday, when something she said displeased him, defendant put a towel under the door so no one could hear, and he "started really wailing" on her. He "continuously" hit her with his fists, hit her with the metal flashlight, kicked her, threatened to kill her, tried to cut her hand with a knife until she was able to twist her

5

hand away, and held a flame to her hand. He told her, " 'It would bring me no greater pleasure than to take everyone away from you [CC]. To take them apart piece by piece in front of you. You watch them suffer and then I'll take you and then I'll kill you.' " He saw how swollen her arms were, and he said, " 'I'm gonna hit them. I'm gonna keep on hitting them until they split open. And when they split open [CC], I'm going to keep on hitting you after that. And then I don't know what I'm gonna . . . do. I really wanna kill you and leave you here so that nobody can help you and I'll just take off.' " At this point CC thought, " 'Okay, he's really going to kill [me].' " She was finally able to escape when they left the house for an errand and then returned. Upon their return, she "lagged behind" defendant as they approached their residence. When he went inside the house, she slammed the door shut from the outside and ran to the neighbors who were in their car.

The same day that CC fled, defendant was arrested at their residence. The police found him hiding in an attic crawl space. Defendant told the police that he and his girlfriend had been arguing for several days and they got into a physical fight. He said that during the argument, " 'I just wanted her to say the relationship was over and she wouldn't do it, so I beat the shit out of her' "; " 'I can't believe I did that.' "

A prosecution mental health expert testified about common domestic violence patterns, including the not uncommon occurrence of recantation by the victim.

*Defense*

CC married defendant while he was in jail for the current charges. At trial, she claimed defendant never physically abused her and never physically assaulted her

6

without her consent.[1] She testified she had "a lot of issues with things about emotional pain"; she was a "pain slut"; she self-mutilates by putting cigarettes out on herself to release overwhelming emotions; she became interested in BDSM at about age 19; before she met defendant she engaged in consensual BDSM practices with a man she met on the Internet; and BDSM "releases emotional stuff." She eventually told defendant about her past and her need for BDSM. In 2011 they began engaging in BDSM practices, including "gang rape play," "rope bondage," branding, choking, spanking, hitting, kicking, and use of riding crops, belts, a flashlight, and other implements. These practices resulted in bruising of CC; the bruises were "like a badge of honor" to her; and they had a "safe word" for her to use if she wanted him to stop.

CC testified some of her injuries, including the cut on her lip, resulted from an accidental fall that occurred when a rope came undone during their BDSM activity. She stated her bruising was the result of their BDSM activity; she asked defendant to inflict the bruising and wanted him to do so; and she "made him do more and continue" even when he did not want to and did not like seeing her in a bruised state. She claimed her parents "made" her report her injuries to the authorities and obtain a restraining order; she had not wanted to do this; and she lied about defendant physically abusing her and threatening to kill her and her family because she was angry at him and when she gets angry she "kind of explode[s]."

---

[1] Although CC was called to testify by the prosecution, her testimony was largely favorable to the defense.

7

To support CC's claims of consensual BDSM activity, the defense presented testimony from CC and a computer forensics expert to show that CC had accessed websites concerning BDSM activity, and from two experts who provided opinions about BDSM and the evidence in the current case.  A defense mental health expert testified CC met the criteria for "masochistic paraphilia based on her sexual excitement and reoccurring fantasies about being humiliated, hurt, and bound, and that this caused her . . . physical injuries."

*Jury Verdict and Sentence*

For the conduct occurring in September 2011, the jury found defendant guilty of (1) torture, (2) corporal injury to a cohabitant, with true findings of personal infliction of great bodily injury and personal use of a deadly weapon (a metal flashlight), and (3) making criminal threats.[2]  The jury also found him guilty of three additional counts of corporal injury to a cohabitant for conduct occurring in April, May, and August 2011.

The court sentenced defendant to an indeterminate life term for the torture count and stayed the sentences on the September corporal injury and criminal threats counts. Additionally, the court imposed a determinate term of five years for the three other corporal injury counts, and a $400 domestic violence fund fee.

---

[2]     The jury found not true an allegation that defendant personally used a deadly weapon (a knife) during the criminal threats offense.

DISCUSSION

I. *Claim of Abandonment by Defense Counsel*

Defendant argues he was deprived of his constitutional right to be represented by counsel because his counsel abandoned him by arguing against him during closing arguments.

A. *Background*

To support his abandonment claim, defendant cites the following italicized portion of his counsel's closing argument:

"In our criminal justice system in the United States, all people, you, me, the D.A., the judge, victims and defendants, we all have rights. You know what's really funny about that? I'm sure you all thought about that as you've been jurors and sitting here, is that most defendants that come to court they're guilty because by the time they've gotten to this point, everybody in the whole process has over and over again adjudged them guilty.

[¶] . . . [¶]

"Detectives, when they get a case . . . what they do is they make and interject their own personal beliefs. . . . [¶] The prosecutors then get that case based on the personal beliefs, and by the time a case gets here, they do their best, they really do, to present all the facts to you in a manner that's supposedly presenting all of them even handedly in a search for the truth. The problem is, that's still skewed towards their personal beliefs, toward the belief that started this whole thing in the first place.

"*Funny thing about our system is that my job, sort of to skew those facts to turn them, to twist them, to bend them. I don't have any burden of proof and I don't have an obligation to search for the truth, but the People do. And it is their obligation to prove to you beyond all reasonable doubts that the person who stands accused is guilty of what they stand accused for. [¶] My craft is smoke and mirrors. My job, according to the system, is to push and push and push and to find all reasonable doubts that I can. Whether or not I think my client is guilty doesn't matter. My job is to do all that to find all reasonable doubt and hope that a juror might bite on my side*. But that's

9

not the prosecution's job.  Their job, as I said, is at no cost to anybody else to prove to you to bring the truth to you so that beyond all reasonable doubts you can make a finding.

"Don't think for one minute that I think Mr. Davidson is guilty of this, but you know what, it doesn't really matter what I think.  Doesn't matter what she thinks, and whether I think he is not guilty and she thinks he is guilty, but at the end of the day, neither one of us are ever going to know.  And the reason neither one of us are ever going to know in this case is because it's all based on the accusations of a single witness who's known to lie, who admits she lied, who came in here to fix that wrong, and is hoping to get that opportunity to do so."

Defendant contends his counsel effectively told the jurors that her role was to deceive and mislead them, they should not believe the defense evidence, defendant was guilty, and she was attempting to fool them into finding otherwise.  He posits this constituted complete abandonment by his counsel, entitling him to automatic reversal. We are not persuaded.

## B.  *Relevant Law*

Complete abandonment by defense counsel requiring per se reversal occurs when counsel has " 'entirely failed to subject the prosecution's case to meaningful adversarial testing.' " (*People v. Banks* (2014) 59 Cal.4th 1113, 1169-1170.)  To justify automatic reversal based on abandonment, the "attorney's failure must be complete"; that is, the failure to oppose the prosecution must occur throughout the proceeding as a whole, not just at specific points.  (*Bell v. Cone* (2002) 535 U.S. 685, 696-697; *Banks, supra*, at pp. 1169-1170.)  Absent complete abandonment, claims of counsel's deficiencies are generally evaluated under the rubric of ineffective assistance of counsel.  (*Banks, supra*, at pp. 1169-1170.)  To establish constitutionally inadequate representation, the defendant

10

must show that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that but for counsel's failings the result would have been more favorable to the defendant. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

Defense counsel has a "duty to represent his client zealously within the bounds of the law and to refrain from arguing against his client." (*People v. Cropper* (1979) 89 Cal.App.3d 716, 720.) However, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage . . . . Judicial review of a defense attorney's summation is . . . highly deferential . . . ." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional representation, and the courts will not find ineffective representation unless there could be no conceivable tactical reason for counsel's acts or omissions. (*People v. Weaver, supra*, 26 Cal.4th at pp. 925-926, 928 [even debatable trial tactics do not constitute ineffective representation].) The courts recognize that "'"[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]"'" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1115.)

## C. *Analysis*

The record reflects that defense counsel presented a lengthy, detailed, forceful closing argument on behalf of defendant, asserting, for example, that the defense had

11

shown CC's trial testimony was the "right version"; the jurors had promised during voir dire to be "open-minded" and to consider whether CC's injuries were "lawfully inflicted" as the result of BDSM activity requested by CC; defendant was not legally responsible for CC's injuries because they were the result of consensual BDSM conduct; it was understandable that the victim lied earlier because her BDSM activity was socially unacceptable and embarrassing; there were numerous deficiencies in the prosecution's investigation that would have shown CC had been lying; and the jury should find defendant not guilty because he did not do anything that CC did not want him to do.

To support his claim of abandonment by his counsel, defendant extracts a small portion of counsel's closing argument, where defense counsel told the jurors that the prosecution had the burden of proof and the defense did not have the burden to prove anything; although the prosecution was supposed to be neutral, its presentation was inevitably influenced by personal beliefs; and the jury should not be swayed by its assessment of any counsel's personal beliefs. While commenting that the defense had no burden of proof, defense counsel briefly interjected that the defense role allowed for the skewing, bending, and twisting of the facts and the creation of "smoke and mirrors." Immediately after using this language, defense counsel stated the defense job was to "push and push" to find all reasonable doubts. Although other attorneys may question the wisdom of defense counsel's selection of words such as skewing, bending, twisting, and "smoke and mirrors," this isolated language does not rise to the level of abandonment or ineffective representation when considered in the context of counsel's closing argument as a whole.

12

First, it is clear defense counsel did not abandon defendant. As stated, counsel argued vigorously for defendant's innocence. Second, defense counsel may have been seeking to garner the jury's trust by candidly acknowledging that the defense will attempt to stretch the facts as far as possible to frame them in the light most favorable to its position, and that this is permissible and expected of a zealous defense advocate in an adversarial legal system. Reasonable jurors could have understood that defense counsel was speaking in hyperbole when referring to such matters as twisting the facts and smoke and mirrors. Even trial tactics that are of debatable efficacy do not rise to the level of constitutionally deficient representation.

Also, there is no reasonable likelihood the jury construed counsel's passing comments as suggesting that defense counsel believed defendant was guilty or that the defense was engaging in fabrication. Refuting any such suggestion, defense counsel repeatedly argued that CC had come to court *to tell the truth* because she had previously lied. Illustrative of this, defense counsel stated, "this whole thing started because of one accusing finger, one accusing witness who we all know is known to lie . . . and who came in here in hopes of doing everything in her power to make it right"; "it's all based on the accusations of a single witness who's known to lie . . . who came in here to fix that wrong, and is hoping to get the opportunity to do so"; "Marcy's Law allows victims to talk. . . . It allows them to say I made a mistake and I want to take it back. It allows them to do that in court before a jury so that jury can say I believe you"; "all you really have is the testimony of one complaining witness, one accusing finger from a person who admitted that she lied who wants to take it back ever so much."

13

To support his claim of counsel abandonment, defendant notes that during rebuttal closing argument, the prosecutor repeatedly quoted defense counsel's reference to "smoke and mirrors." For example, the prosecutor argued: "Defense counsel said it best when she started off her closing argument this morning. Smoke and mirrors, that's her job as a defense attorney, and the defense is completely right they don't need to put on any evidence. It's the People's burden of proof beyond a reasonable doubt to prove to you what happened in this case. But what the defense has done here is the game of smoke and mirrors they're playing, and that's the entire context of this BDSM issue that they are bringing to light. Smoke and mirrors. It's their job to confuse you about the real issues, about what really happened . . . . [¶] . . . [¶] . . . It was not BDSM like conduct that was going on in this case and caused these injuries. That's smoke and mirrors. . . . [¶] . . . [¶] And they want you to believe that Dr. Abrams has the accurate diagnosis for [CC]. . . . His opinion is based on her own words, for the most part. Smoke and mirrors . . . . [¶] . . . Again, the defense has thrown out a lot of stuff that's smoke and mirrors . . . ."

Considering the record as a whole, we are satisfied the prosecutor's quoting of the colorful "smoke and mirrors" language used by defense counsel did not undermine the efficacy of defense counsel's representation. Reasonably intelligent jurors would understand that the prosecutor was presenting the People's case as forcefully as possible, and would not rely on the prosecutor's use of this language to infer defense counsel thought defendant was guilty or the defense was fabricating its case.

For the same reasons, even if the portion of defense counsel's closing argument cited by defendant is deemed an unreasonable tactical approach, it did not rise to a

14

complete failure to subject the case to meaningful adversarial testing so as to constitute abandonment. Defense counsel strenuously defended the case during both the evidentiary presentation and closing arguments. And, applying the prejudice standard for counsel error, there is no reasonable probability the outcome would have been different absent the complained-of statements. Defense counsel's closing argument thoroughly presented theories to support the defense, and there is no reasonable likelihood the jury would have relied on the portion referring to "smoke and mirrors" to discredit the extensive defense evidentiary presentation and arguments. Indeed, reflective of the jurors' careful consideration of the evidence, they rejected the allegation that defendant used a knife during the criminal threats offense. (See fn. 2, *ante*.)

## II. *Claim of Instructional Error Concerning Consent*

Per request by defense counsel, the trial court instructed the jury on the defense of reasonable belief in consent, stating: "The defendant is not guilty of torture, corporal injury to spouse or criminal threats if he did not have the intent or mental state required to commit the crime because *he reasonably did not know a fact or reasonably and mistakenly believed a fact*. [¶] *If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be*, he did not commit [the charged offenses]. [¶] If you find that the *defendant believed that [CC] consented to being battered and*

15

*threatened and if you find that belief was reasonable*, he did not have the specific intent or mental state required for [the charged offenses]. . . ."  (Italics added.)[3]

Defendant argues these consent instructions were insufficient and the trial court had a sua sponte duty to instruct that (1) there was no crime if CC actually consented to being battered, tortured, or threatened, and (2) the absence of consent was an element of the offenses that the prosecution had the burden of proving beyond a reasonable doubt. We disagree.

There are a variety of offenses that allow for a consent defense and/or that include lack of consent as an element of the offense.  (See, e.g., *People v. Ireland* (2010) 188 Cal.App.4th 328, 336 [lack of consent is element of rape]; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 474-475 [lack of consent is element of kidnapping]; *People v. Andrews* (2015) 234 Cal.App.4th 590, 602-603 [lack of consent is element of misdemeanor sexual battery]; *People v. Sherow* (2011) 196 Cal.App.4th 1296, 1302-1304 [consent may be

_____

3       Based on the language of CALCRIM No. 3406 (entitled "Mistake of Fact"), the instruction in its entirety stated:  "The defendant is not guilty of torture, corporal injury to spouse or criminal threats if he did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact.  [¶]  If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit torture, corporal injury to spouse or criminal threats.  [¶]  If you find that the defendant believed that [CC] consented to being battered and threatened and if you find that belief was reasonable, he did not have the specific intent or mental state required for torture, corporal injury to spouse or criminal threats.  [¶]  If you have a reasonable doubt about whether the defendant had specific intent or mental state required for torture, corporal injury to spouse or criminal threats, you must find him not guilty of those crimes."
        The jury was further instructed:  "A person may express consent by words or acts that are reasonably understood by another person as consent.  [¶]  A person may also express consent by silence or inaction if a reasonable person would understand that the silence or inaction intended to indicate consent."  (See CACI No. 1302.)

16

defense to burglary].)  When lack of consent is an element of an offense, the trial court is required to instruct the jury about the consent defense and that the prosecution has the burden of proving the absence of consent beyond a reasonable doubt.  (See *People v. Sattiewhite, supra,* 59 Cal.4th at pp. 474-475; *People v. Acevedo* (1985) 166 Cal.App.3d 196, 203-204; *People v. Bruce* (1989) 208 Cal.App.3d 1099, 1104.)

The offenses charged here (torture, infliction of corporal injury on a cohabitant, and criminal threats) do *not* include the element of lack of consent nor are they normally subject to a consent defense.  (See Pen. Code, §§ 206, 273.5, 422; *People v. Pre* (2004) 117 Cal.App.4th 413, 419; *People v. Campbell* (1999) 76 Cal.App.4th 305, 307-308; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228; *People v. Samuels* (1967) 250 Cal.App.2d 501, 513.)  Further, numerous courts have concluded that consent is generally *not* a defense to conduct involving serious bodily injury and terrorizing threats even when based on a claim of consensual sadomasochistic activity.  (*People v. Samuels, supra*, 250 Cal.App.2d at pp. 512-514 [consent not defense to aggravated assault charge arising from severe beating inflicted for creation of sadomasochistic film]; *State v. Van* (Neb. 2004) 688 N.W.2d 600, 614-615 [consent not defense to assault and terrorist threats charges involving serious injury from BDSM activity]; *Govan v. State* (Ct. App. Ind. 2009) 913 N.E.2d 237, 241-243 [consent not defense to battery during sadomasochistic sexual activity if battery is "atrocious or aggravated" or deadly weapon used]; *Commonwealth v. Appleby* (Mass. 1980) 402 N.E.2d 1051, 1060; *State v. Collier* (Iowa Ct. App. 1985) 372 N.W.2d 303, 306-307; see *People v. Alfaro* (1976) 61 Cal.App.3d 414, 429 ["Consent is not a defense to an assault that results in great bodily injury."].)  The courts reason:

17

"Whatever rights the defendant may enjoy regarding private sexual activity, when such activity results in the whipping or beating of another resulting in bodily injury, such rights are outweighed by the State's interest in protecting its citizens' health, safety, and moral welfare." (*Collier, supra*, 372 N.W.2d at p. 307.) And, as stated in *Samuels*, "It is also the rule that the apparent consent of a person without legal capacity to give consent, such as a child or insane person, is ineffective. [Citation.] [¶] It is a matter of common knowledge that a normal person in full possession of his mental faculties does not freely consent to the use, upon himself, of force likely to produce great bodily injury." (*Samuels, supra*, 250 Cal.App.2d at pp. 513-514.)

Here, the charged conduct involved serious physical injuries and terrorizing threats to kill. Under these circumstances, the trial court properly refrained from providing a broad instruction that consent was a defense that rendered the conduct lawful and that absence of consent was an element of the offenses.

As set forth above, the trial court did present the defense theory of consent to the jury via a narrow instruction that focused on defendant's intent and mental state, stating that if defendant reasonably believed that CC consented to being battered and threatened, he did not have the required state of mind for the charged offenses. (See *People v. Andrews, supra*, 234 Cal.App.4th at p. 602 [" 'reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent' "]; *People v. Walker* (2006) 139 Cal.App.4th 782, 803, 807 [recognizing defendant's intent may not have been criminal if injury occurred mistakenly or accidentally during consensual "rough sex"]; *Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 375.) Because the issue is not before

18

us, we express no opinion on whether this instruction was warranted or required under the particular charges and facts of this case.

In any event, the fact the court assessed there was a sufficient evidentiary basis to warrant an instruction on reasonable belief in consent does *not* mean that charges involving serious physical injury and criminal threats should be defined to include absence of consent as an element or to trigger the general availability of consent as a defense. To the contrary, when the proscribed conduct is severely physically injurious and criminally threatening, public policy supports a narrow application, and in some cases a complete rejection, of consent principles. On the facts of this case showing highly injurious and threatening behavior, the court had no duty to provide the consent instructions requested by defendant on appeal. The jury was of course free to consider the BDSM evidence when deciding whether the prosecution had proven all the elements of the charged offenses beyond a reasonable doubt; however, it was *not* required to evaluate whether the victim's consent rendered the seriously injurious and threatening conduct lawful even if the elements of the offenses were otherwise proven.

To support his position that broad consent principles apply here, defendant contends he and the victim "had a constitutionally protected interest in participating in BDSM, which by its nature involves consent to being battered, tortured or threatened," citing *Lawrence v. Texas* (2003) 539 U.S. 558. In *Lawrence*, the court recognized a constitutional right to engage in consensual adult homosexual activity, and accordingly invalidated a state statute criminalizing this behavior. (*Id.* at pp. 563, 578.) The *Lawrence* court reasoned the government should not set boundaries on consensual adult

intimate relationships "*absent injury to a person*," and underscored that the case before it did not "involve persons who might be *injured*." (*Id*. at pp. 567, 578, italics added.) Unlike the circumstances in *Lawrence*, the conduct at issue in this case involves serious physical injury and terrorizing behavior. *Lawrence* does not provide authority for defendant's position. (*State v. Van, supra*, 688 N.W.2d at p. 615 [*Lawrence* did not extend constitutional protection to physically injurious sexual activity].) Defendant has presented no persuasive argument to support that voluntary participation in sadomasochistic behavior warrants allowing seriously injurious and criminally threatening condut to be broadly subject to a consent defense akin to offenses that involve no such injurious or threatening behavior. As stated, public policy dictates otherwise.

Defendant posits the instructions on reasonable belief in consent allowed the jurors to find in his favor only if they found his belief in consent was *mistaken*. Assuming, without deciding, that the reasonable belief in consent instruction was warranted on the particular facts of this case, there is no reasonable likelihood the jurors interpreted the defense to apply only to a mistaken belief. (See *People v. Sattiewhite, supra*, 59 Cal.4th at p. 475.) The reasonable belief in consent instruction, which in written form is entitled "Mistake of Fact," includes language stating defendant did not have the required mental state if he reasonably and mistakenly believed CC consented, as well as language that references reasonable belief in consent with no mention of the mistake concept. (See fn. 3, *ante*.) Notably, there is nothing in the instruction that explicitly or implicitly states the reasonable belief in consent defense is unavailable if

20

defendant accurately assessed that CC consented.  Further, during closing arguments both counsel set forth their respective positions as to whether CC truthfully testified that she consented to the assaultive conduct as part of BDSM activity, and counsel did not suggest a reasonable belief in consent was a defense only if defendant was mistaken about CC's actual consent.[4]  Considering the instruction and the record as a whole, reasonable jurors would have understood that the instruction meant the reasonable belief in consent defense was available *even if* defendant's belief in CC's consent was mistaken rather than accurate.  No reasonable juror would have thought the jury could not apply the reasonable belief in consent defense if defendant's belief was an accurate perception of CC's wishes.

There was no instructional error.[5]

### III. *Improper Domestic Violence Fund Fee*

As conceded by the People, the trial court erred in ordering defendant to pay a $400 domestic violence fund fee pursuant to Penal Code section 1203.097.  This section provides:  "*If a person is granted probation* for a crime in which the victim is a person

---

[4]     For example, the prosecutor argued:  "In this case it comes down to which version of events you believe.  Do you believe the ones that were initially reported to law enforcement, or the story given by [CC] in court over the past couple of weeks? . . . [¶] . . . [¶]  So I want to talk about why we shouldn't believe what she had told us in court . . . , and why you should believe the initial versions that she gave . . . ."

Illustrative of the contrary argument, defense counsel stated, ". . . Ladies and Gentlemen, you have to believe that the in-court testimony is the right testimony.  That's why you have to find him not guilty, because this was the result of BDSM conduct.  It was the result of [CC] saying she wanted it.  And that [defendant] didn't do anything to [CC] that she didn't ask for or want."

[5]     Given our holding, we need not address the People's contention of forfeiture.

21

defined in Section 6211 of the Family Code [defining domestic violence victims], *the terms of probation shall include*" a fee to be disbursed to specified domestic violence funds. (Pen. Code, § 1203.097, subd. (a)(5), italics added.) Because defendant was not granted probation, the fee does not apply. Accordingly, we modify the judgment to strike the fee. (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1520.)

## DISPOSITION

The $400 domestic violence fund fee imposed under Penal Code section 1203.097 is stricken from the judgment. As so modified, the judgment is affirmed. The superior court is directed to modify the abstract of judgment to remove the $400 domestic violence fund fee, and to send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


HALLER, Acting P.J.

WE CONCUR:


MCDONALD, J.


MCINTYRE, J.

22